JOHN M. FLETCHER, GUARDIAN, *v.* SOVEREIGN CAMP WOODMEN OF THE WORLD.

PEREMPTORY INSTRUCTION.     *When should be given.     Civil cases.*

In civil cases facts are not required to be shown with absolute certainty, but where the evidence is such that the trial judge would not allow a verdict for one party to stand, he should, if requested, give a peremptory instruction for the other.

2. LIFE INSURANCE.     *Suicide.     Evidence.     Verdict of coroner's jury.*

In an action on a policy of life insurance, which by its terms was to be void in case the insured committed suicide, where the contract does not provide that the insurer shall be furnished with a certificate or copy of inquest proceedings as part of the proof of death or otherwise, the finding of a coroner's inquest jury that the decedent committed suicide is not admissible in evidence, but its admission is not always reversible error. *Knights of Honor* v. *Fletcher*, 18 Miss.; 377, *limited.*

FROM the circuit court of Attala county.

HON. JAMES H. NEVILLE, Judge.

Fletcher, guardian, the appellant, was plaintiff in the court below; the Sovereign Camp Woodmen of the World, appellee, was defendant there.     D. B. Noah was the holder of a benefit certificate in the Sovereign Camp Woodmen of the World, a benevolent society and mutual insurance company, payable at his death to his two infant daughters, as beneficiaries, but the contract provided that it should be void if the insured committed suicide.     Noah died at Fayette, Miss., away from his home, which was at Kosciusko, in this state, December 1, 1899.     This suit was brought by appellant, as guardian of the children of Noah, to recover the amount of the certificate. The defense was that Noah committed suicide.     The cause was tried at the March, 1901, term of the Attala county circuit court, and resulted in a verdict for defendant, but, on motion

of plaintiff, the verdict was set aside. At the September, 1901, term of that court the case was again tried, and there were verdict and judgment for defendant, the court giving a peremptory instruction to find for defendant. From that judgment plaintiff appealed to the supreme court, and defendant prosecuted a cross appeal from the order setting aside the former verdict in its favor. The only issue was whether or not Noah committed suicide. The evidence on the part of defendant was, in substance, as follows: Noah and one Perkins occupied the same room in a hotel at Fayette the night of November 30, 1899. The next morning Perkins got up early and went to his work, and left Noah in the room alone. Noah was awake when Perkins left, and they had some conversation. About two hours afterwards Noah was found dead, lying across his bed in his night clothes, with a gunshot wound entering his body just above and in rear of the right ear, passing out just above and in the rear of the left ear, with a pistol gripped in his right hand, powder indications on left forefinger and thumb and on the side of the head near the wound, and one chamber of the pistol freshly discharged. He was lying in a pool of blood, his brains issuing from the wounds. He had a gold watch and $1.40 in money in his pockets. He had requested an acquaintance in Fayette to have his remains shipped to Kosciusko if anything should happen to him—if he should be killed—and afterwards wrote a note reminding this acquaintance of his promise to comply with the request. A few days before his death he went hunting with a friend and talked with him about his life insurance, and told him that, if he (Noah) should be killed, or fall down and kill himself, to roll him in the buggy and carry him to town and turn his body over to Tom (the person he had requested to send his remains to Kosciusko). While hunting, he was found with his gun muzzle resting on his breast, in a dangerous position, and was seen that day sitting on a log near some bushes, with his handkerchief to his eyes, crying. The pistol in Noah's hand was a 38

Smith & Wesson, and a ball in the wall of his room was a 38-caliber ball. There were some unsatisfied judgments against Noah for more than $1,000, and he owed his landlady in Fayette $20, and he was in arrears with an insurance company, for which he had been working, to the extent of $100, and had been written to several times about it, and had promised to pay it the day he died.

The evidence for plaintiff was that a bullet was found in the wall of the room about forty-four inches from the floor, and that Noah's head was only about twenty-two inches above the floor, and that the bullet ranged downwards. There was also some testimony of parties who looked at the corpse at Kosciusko to the effect that they saw no wound or hole in the head of the deceased, but saw a bruise just under one of his eyes.

*Dodds & Luckett*, for appellant.

It was an error in the trial judge to permit the verdict of the coroner's jury to be read in evidence, over the objection of the plaintiff. 2 Bacon on Benefit Societies (2d ed.), sec. 471; *U. S. Life Ins. Co.* v. *Kielgast*, 26 Ill. App., 567; *Davey* v. *Ætna Life Ins. Co.*, 36 Fed. Rep., 650; *Ætna Life Ins. Co.* v. *Ward*, 140 U. S., 76; 11 S. C. R., 720.

"Where, upon the death of a person whose life is insured, the defense is that the death was by suicide, and the manner of death is not known, the presumption is against suicide, and the burden of proof is on the insurers to show that to have been the cause of death." *Mallory* v. *Travelers Ins. Co.*, 47 N. Y., 52; s.c., 7 Rep., 410; 2 Ins. L. J., 830; *Gibson* v. *Am. Mut. Life Ins. Co.*, 37 N. Y., 580; s.c., 1 Big. Life & Acc. Ins. Co. Cas., 590; *Germain* v. *Brooklyn Life Ins. Co.*, 14 N. Y. Week Dig., 286; s.c., 18 *Id.*, 107; *Phillips* v. *Louisiana, etc., Ins. Co.*, 26 La. Ann., 404; s.c., 21 Am. Rep., 549; *Hancock Mut. Life Ins. Co.* v. *Moore*, 34 Mich., 31.

Where the fact of death is established, and the evidence points equally or indifferentially to accident or suicide as the

cause of it, the theory of accident, rather than that of suicide, is to be adopted. *Cronkhite* v. *Travelers Ins. Co.*, 75 Wis., 116; *Travelers Ins. Co.* v. *McConkey*, 127 U. S., 661; s.c., 43 N. W. Rep., 741; 19 Ins. L. J. 267.

A careful examination of the entire record shows many facts and circumstances in this case entirely consistent with an accident, rather than design, to bring on the death of D. B. Noah, which abundantly sustain our contention that the jury should have been permitted to hear all the testimony of the witnesses, see their demeanor on the stand, their fairness or unfairness, and bring in a finding on the facts.

We think the reasoning of the court on the law and the facts in this case, or one very much like this, as to how Noah came to his death, to be found in 111 Fed. Rep., 773, decided by the United States court of appeals, fifth circuit, November 19, 1901, unanswerable, and we invite the court to examine it carefully and see how refreshingly clear the law governing the case and the facts in the same are analyzed by that able tribunal.

*C. H. Campbell* and *J. A. P. Campbell*, for appellee.

This case involved the investigation of the suicide of Noah, whose death by his own hands gave rise to the case of the *Supreme Lodge Knights of Honer* v. *John Fletcher, Guardian, etc.*, 78 Miss., 377. The facts of the present case are the same as in the former, testified to by the same witnesses, with some additional testimony not produced in the other case, which makes it clearer, if possible, that Noah took his own life. Additional facts are, that there were unsatisfied judgments for more than $1,000 against Noah, that he owed his landlady in Fayette $20, and that he was in arrears with the insurance company for which he had been working some $100, and had been written to several times about this and had promised to pay it on the day he killed himself.

There never was, and never will be, more conclusive evidence

of one's killing himself intentionally than is furnished by this case, except where credible persons witnessed and proved the suicide. This court so declared in the case above cited, and so did the circuit court of appeals in *Fidelity Co.* v. *Love,* 111 Fed. Rep., 773.

Noah was found in the morning lying upon a bed, which he had occupied the night before, with his feet upon the floor, his head about the middle of the bed, in a pool of blood issuing from two orifices, one on the right and the other on the left of his head just above the ears; with a pistol grasped in his hand, one chamber of which had been recently discharged. He had been dead, when discovered, something like two hours. The room had been occupied the night before by a friend of his, with him, who had gone out for an early breakfast, closing the door after him. There is not a suggestion or hint nor shadow of ground for suspicion that death came by any other means than from the pistol in the hands of Noah. The only effort to impair the force of this convincing testimony as to the manner of Noah's death consisted of evidence that a bullet was found in the wall of the room about forty-four (44) inches from the floor, while Noah's head was about twenty-two (22) inches from the floor, and that the range of the bullet was downward. The worthlessness of such testimony is manifest. What the position of Noah was when he fired the fatal shot is a matter of conjecture. He may have been standing by the bedside, or sitting upon it, and have fallen backwards, as found. Nothing can be known as to this. There remains the indisputable fact that he was found in his blood, with the instrument of death in his hand, with his feet upon the floor, and with the orifices of entrance and exit of the fatal missile. It is impossible to know what his precise posture was. If standing or sitting on the bedside when the fatal shot was fired, or lying down with his head in a certain position, all difficulty about the course of the bullet vanishes.

Nothing is more uncertain than the course of a bullet after

it strikes an object.   It seems most probable, if we enter a field of conjecture, that Noah did not place himself in the position in which he was found in order to shoot himself, but most likely that he would stand or sit so as to fall back upon the bed.   His feet being on the floor, and his arms and hands as they were, strongly suggest this.   We think he stood by the bed and fell back instantly, the natural effect of which was to cause his hands to be where they were and the blood to be found, as it was, in the middle of the bed, and nowhere else. He probably placed his left hand on the muzzle of his pistol, to steady it on the right side of his head, and that accounts for the powder burn on the left hand.

The fact that divers persons in Kosciusko looked at Noah's body in the coffin and did not see the bullet holes in his head amounts to nothing.

None can doubt that the bullet holes were there and caused death.   Two reputable physicians, the sheriff of the county, the barber who shaved the deceased, the assistant in preparing the body for the coffin, a coroner's jury and divers others saw the corpse, saw the holes in the head and brains issuing from them and the blood gushing from them.

The suggestion of murder is the wildest conjecture.   Noah's roommate must have been barely gone from the room when he shot himself.   As the hour approached for him to take the train, if he was to go, and for which he had made no preparation, he killed himself.   Why, God only knows.   We poor mortals may conjecture.   The course of the bullet shows the impossibility of a murderer having fired it.

There is much to suggest that Noah contemplated suicide. His oral and written request for his body to be sent to Kosciusko in case of his death; his strange conduct on the hunt with Arnold; his preparation in borrowing a pistol, which he did not return at the end of the trip for which he borrowed it; keeping it, although he said he was going to Kosciusko for a month's stay; owing his landlady at Fayette $20 and $100 to

his company which he had been written to about several times; his payment of his saloon bill and of the newsboy the night before his death; his talk of going home; his want of preparation for the trip, no trunk packed, no money except $1.40 when the train was due about half past nine o'clock; his unusual cheerfulness and joviality characteristic of suicides, supplement the ghastly presentation of the corpse and its environment, and exclude all doubt as to suicide.    A doubting Thomas could not honestly doubt the evidence.

This court has pronounced it overwhelming and the United States circuit court of appeals said it was "almost if not quite conclusive that the deceased held the pistol that fired the shot."

It was not error to admit the verdict of the coroner's jury in evidence, but if it was, the evidence of suicide was so well established by other testimony as to make the mere admission of this cumulative evidence harmless and no ground for reversal.

Argued orally by *J. A. P. Campbell*, for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

There is no material difference between the evidence in this cause and that in the case of *Supreme Lodge* v. *Fletcher*, 78 Miss., 377; 28 South., 872; 29 South., 523.    The evidence before the circuit court of appeals of the United States does not materially vary the case.    It seems to us very obvious from the opinion of Shelby, circuit judge (*Fidelity, etc., Co.* v. *Lover*, 111 Fed., 773; s.c., 49 C. C. A., 602), that the circuit court of appeals would have affirmed the action of the district judge if he had granted the peremptory instruction.    That court distinctly says that the evidence "seemed to show, almost if not quite conclusively, that the deceased held the pistol that fired the shot," but because it was not "absolutely certain that he committed suicide," from the evidence, the court was

constrained, under its rules of practice, not to reverse the action of the district judge in refusing the peremptory instruction. As we construe this language, it is perfectly manifest the granting of the instruction would have been approved. No fact is required in civil cases, under our practice, to be shown with absolute certainty,'' where the lower court would not be willing, on the evidence, to permit a verdict to stand, except for one party, under our practice the court should give a peremptory charge. We think the evidence in this case is so clear and convincing that Noah did commit suicide that the circuit judge should have refused to allow a verdict for plaintiff to stand, if rendered; and, under the practice obtaining in this state, it has long been settled that whenever that is the case the court should give a peremptory instruction for the party for whom alone it would permit a verdict to stand. It may be said, in passing, that if the terms of the policy here vary from the terms of the policy in the case in 78 Miss., 28 South., 29 South., and if, as we think, the verdict of the coroner's jury was incompetent in this case as evidence of the cause of death, it nevertheless remains true that the evidence of suicide is so overwhelming that the peremptory instruction should have been given, whether the coroner's verdict was in or out, since, either way, no verdict could have been properly reached, except for the defendant.

*Affirmed.*