No. 22,015.

OLIVE McCOY, *Appellee,* v. THE CENTRAL STATES LIFE INSURANCE COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

LIFE INSURANCE — *Suicide—Conflicting Evidence—Judgment Sustained.* In an action upon a policy of life insurance containing the provision that in case of suicide within one year from the date of the policy the liability of the company shall be limited to the amount of the premium paid, the evidence is held sufficient to sustain a finding and judgment against the defendant.

Appeal from Johnson district court; JABEZ O. RANKIN, judge. Opinion filed April 12, 1919. Affirmed.

*E. M. Grossman,* and *J. L. Hornsby,* both of St. Louis, Mo., for the appellant.

*C. W. Gorsuch,* and *J. D. Johnston,* both of Olathe, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Action upon a policy of life insurance by the widow of the insured, who was named as beneficiary. The defense was that the death of the insured was caused by his suicide. The policy contained the provision that in case of suicide the liability of the insurance company should be limited to the amount of the premium paid. There was a verdict for plaintiff for the full amount of the policy, $5,000 and interest. A motion for a new trial was overruled, and the defendant appeals.

John G. McCoy, the insured, signed the application for insurance September 18, 1917; the policy, though dated October 1, was not delivered until November 3, 1917. The petition alleged that on November 9, 1917, "John G. McCoy died from the effect of a gunshot wound in his head, said gunshot wound being accidentally inflicted by himself, or inflicted by some

person unknown, with felonious intent, him the said John G. McCoy to kill and murder."

The answer alleged that the death was caused by suicide, and the company tendered the return of the note given by the insured in payment of the premium. The reply was a general denial.

The plaintiff rested her case after proving the issuance of the policy, the acceptance of the insured's note for the premium, and the giving of notice and proof of death. Mr. Alderson, who was the local insurance agent of the company, testified for the defendant, in substance, as follows: About September 18, 1917, Mrs. McCoy came to his bank in Olathe and inquired about the rates for a $5,000 policy of life insurance upon her husband. He gave her the rates, and on the next morning went to the McCoy home in the country, taking with him Doctor Moberly, one of the local examining physicians for defendant. At that time Mr. McCoy declined to be examined, and stated he would be in town in a short time. The witness saw McCoy on the street a few days afterwards, and went with him to Doctor Moberly's office. Mrs. McCoy accompanied them, and the witness explained the policy to both of them. There was one feature of the policy that both Mr. and Mrs. McCoy were particular to inquire about, which was the suicide clause, and they wanted to know what amount would be paid in case of suicide the first year. He explained the suicide provision in the policy to them, asked if they understood it, and they said they did. The same witness and Doctor Moberly both testified that McCoy declined to be examined when they saw him the first time; that Mrs. McCoy insisted he should be examined, and urged him to take out the insurance; that he acted as if he did not want the insurance—said he couldn't make up his mind, and would let it go until some other time. Alderson also testified that on October 4 he started to the home of the McCoys to make a delivery of the policy and met Mr. and Mrs. McCoy on the road coming to town; that McCoy said he did not want the policy, as it was too much insurance for him, and would be too much of a burden for him to keep up; and that while the witness was arguing with him to induce him to take the policy, Mrs. McCoy insisted that her husband should

McCoy v. Insurance Co.

take out the insurance for her protection and that of their daughter.

Although the petition was framed upon the theory that the insured did not die a natural death, and was either murdered, or killed himself accidentally, the plaintiff made no attempt in her evidence in chief to explain any of the circumstances connected with her husband's death. McCoy at the time of his death was 51 years old and had no other insurance. He lived on a farm which he rented from his cousin, James McNeal. McNeal testified that he had lived on the farm himself for 47 years; that he had no family; that at the time the McCoys occupied the place he lived in the same house with them, sleeping downstairs; that on the morning of November 9, at about a quarter past five o'clock, Mrs. McCoy came to the door of his room and called him; and that he was already up and dressed. He opened the door, and she said she had heard a shot. She had a lantern in her hand, and she and the witness went out of the house together toward the stable. She then told him that she guessed McCoy must have gone up after the horses, and they went to the pasture gate, and then returned to the yard, and she asked him to go and get Mr. Lancaster, a neighbor. When he and Lancaster returned they found Mr. Westhoff, another neighbor, there. Mrs. McCoy, in the meantime, had prepared breakfast, and while the witness was eating, Mrs. McCoy told him they had found McCoy dead. She was not crying and did not seem to be excited or nervous. When she came to his room that morning she did not tell him that McCoy had left the house, but when they had gone toward the stable she said she guessed he had gone out to the pasture after the horses.

Mr. Lancaster testified that when he was at the house Mrs. McCoy told him that they had been looking for her husband for some time. He and Westhoff started out to a straw stack some distance north, and Mrs. McCoy said: "When you find him, I want it understood it is an accident, and not to touch him." Witness testified that they were then standing in the yard, between the house and the barn, and started north, going about twenty-five or thirty feet when they found the body of McCoy lying five or six feet from a pile of lumber and parallel thereto; no part of the body touching any object; the head to

the south and the feet to the north, near a path that runs there. He and Westhoff then started back and met Mrs. McCoy, who asked if they had found him, and they told her they had. She asked where, and when they told her, she started there, whereupon witness advised her not to go, and she said all right, and went into the house. She did not cry at that time, nor appear hysterical, nor make any outward emotion of sorrow—simply turned around and went back to the house. When witness returned, there were other persons there, and he made a more careful examination of the situation. McCoy's body was lying flat on the back with the arms rather extended, the right arm extended out. There was a wound by the right ear, and it looked as if there might have been powder burns around the wound; there was something dark on the left hand, on the front side of the index finger pointing in to the thumb. There was a single-barreled shotgun lying across one leg; the stock seemed to be at the right of the left foot, the barrel being pointed right across the leg well up near the waist line. There was some blood on the right side over the waist. When the gun was opened, there was a shell in it. The sheriff, who arrived, made a demonstration with the gun in his hand, sitting down on the ground and showing what position a man could get into if he intended to shoot himself. The sheriff sat flat on the ground and took the gun and put the barrel to his ear and reached the trigger with his other hand, holding the muzzle of the gun with his left hand close to the head, and showing he could reach the trigger with his right hand.

Westhoff, the other neighbor, testified that Mrs. McCoy came to his house and asked him to come over immediately, but did not state why she wanted him. He took his lantern and started with her, and on the way back she told him that John had gotten up and that they could n't find the gun; that she had heard a shot; that John said he was going after the horses, but that the halters were still in the barn, and that she couldn't find him; and that she then said to him, "If you find him, you must not touch him. The law can handle you for touching a dead person if you find—if he is dead"; that when he and Lancaster, continuing the search, started towards the straw stack, a little distance from the house, Mrs. McCoy said to them: "If anything has happened, remember it is an accident"; and that she then went back to the house.

McCoy v. Insurance Co.

The sheriff of Johnson county described the locality where McCoy's body was found, and testified that the body was lying on the back; that McCoy's hat lay about six feet northwest of the body; and that there was a gunshot wound through the head, the shot having entered on the right side, and blood and brains lay scattered about. Up and down between the legs and lying on him was a single-barreled 12-guage shotgun with the muzzle end upwards. McCoy's left hand lay on his hip, and the other hand was outstretched. There were powder marks on the side of the face, which indicated to the witness that the gun was discharged close to the head, and the left hand was powder-marked between the fingers and thumb, indicating that the left hand was pretty close to the barrel of the gun. The sheriff described the demonstration he made to the others present in order to show that it was possible to discharge the gun and hold it to the side of the head of a person in a sitting position, and testified that it was possible to reach the trigger of the gun with the right hand, so that the gun could be fired in that position.

Doctor Moberly, the coroner, who was one of several local examining physicians of the insurance company, was present when the sheriff made the demonstration, and he and the sheriff were so well convinced that it was a case of suicide that no inquest was held. The witness Westhoff was also present when the body was found, and he corroborated the other witnesses as to the conditions, the location of the gunshot wound, and the powder burns near the wound in the head, and on the finger and thumb of the left hand.

Mrs. McCoy was called in rebuttal, and testified that on the morning of her husband's death they got up about five o'clock; that they heard a disturbance out among the chickens; that her husband slipped his clothes on as quickly as he could and went downstairs; that she did not know he was going to take the gun out, or that the gun was gone; that there was a single-barreled shotgun kept in the kitchen behind the door; that about ten minutes after he had gone, the witness went down and, in the meantime, had heard the report of a gun; that before her husband left the house she heard the chickens "squeaking or fussing"; that the chicken house is northeast from the dwelling house; and that the body was found in the

direct line leading from the house to the chicken house, up the path which the husband would have traveled in going toward the chicken house. It was about fifteen or twenty minutes after she heard the noise in the chicken house before she heard the report of the gun. She testified that her husband intended to husk corn that morning and had brought the wagon out and put on the sideboards and greased the wagon the night before; that when Mr. Lancaster arrived she told him and Westhoff she had heard the discharge of the gun and did not know what had happened, and wished they would look around and see if they could find McCoy; that if they found him not to touch the body, to keep away until the sheriff came; and that the reason she asked them not to touch the body was that she believed the man had been murdered, and she thought if he had been murdered, when the sheriff came, bloodhounds could be brought.

Mr. Alderson testified that about ten o'clock on the morning of McCoy's death he went to the McCoy home; that he saw the body, and saw Mrs. McCoy; and that he asked her then if she remembered what he had told her in regard to the suicide clause in the policy, and she said that she did, but that "in this case it was an accident."

There was no conflict in the evidence respecting the conditions and circumstances surrounding McCoy's death. It is true that several witnesses testified to conflicting statements made by Mrs. McCoy about what occurred when her husband left the house in the early hours of that morning, and that the first story she told was that she thought her husband had gone to the pasture after the horses, until she found that the halters had not been taken from the barn. Other persons she talked to later testified that she said her husband had heard a disturbance among the chickens, and that he went out to discover the cause. In her rebuttal testimony, she did not deny making the statements to her neighbors that in case they found the body to remember that "it was an accident," nor did she deny making the statement testified to by the insurance agent, Alderson, that, "in this case it was an accident." Although the testimony concerning her statements was not contradicted, it was for the jury to determine its effect; and, besides, her statements did not establish suicide as the cause of McCoy's death. At most, they indicated her anxiety not to have any trouble over the insurance.

McCoy v. Insurance Co.

There is a presumption against suicide, where the cause of death is unknown, and the burden in this case was on defendant to establish that the insured took his own life. While the evidence would have sustained a finding in defendant's favor, it was purely circumstantial, and it cannot be said that the verdict was wholly unsupported by the evidence. (*Heath v. Life Association*, 89 Kan. 634, 132 Pac. 148.)

The judgment is affirmed.

PORTER, J. (dissenting) : The testimony shows that the conflicting statements of Mrs. McCoy were made at a time when she had not viewed the body, and, presumably, knew none of the conditions or circumstances which would indicate the manner of her husband's death. That she made the statements to her neighbors is uncontradicted, and the statements themselves, and the testimony as to her conduct when she was told that her husband's body had been found, show that her sole anxiety related to the insurance which had been taken out but a few days before, with the thought uppermost in her mind and that of the insured as to the effect upon the policy in case of his suicide. Assuming that Mrs. McCoy was not aware, until after her husband left the house, that he had taken the shotgun with him, and that she knows nothing more about his death than her testimony discloses, there is no conflict in the testimony as to the cause of his death. The conditions in which the body was found, the nature and location of the wound, the powder burns on the head and on the left hand, and the position of the discharged shotgun, all show suicide, and none of the disinterested neighbors, the sheriff, nor the coroner, who examined the body, had any doubt about the cause. The bare reading of the testimony would indicate that no one who was present at the trial could have had the slightest reason for believing that the wound which caused the death of the insured was not self-inflicted. Under the circumstances, I think it was the duty of the trial court to set aside the verdict.

So far as the Heath case, cited in the majority opinion, is concerned, I have always felt that it was wrongly decided; and I would have dissented from the opinion at the time had it not been rendered "per curiam."

WEST and DAWSON, JJ., concur in the dissent.