No. 23,163.

ELIZABETH O'BRIEN, *Appellee*, v. THE NEW ENGLAND MUTUAL
LIFE INSURANCE COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. LIFE INSURANCE—*Evidence Supports Verdict Against Suicide.* In an
action upon an insurance policy in which a recovery against the de-
fendant could not be had if the insured committed suicide it is held
that the evidence was sufficient to support a verdict for the plaintiff.

2. SAME—*Communication by Client to Attorney Privileged.* Communica-
tions made to her attorney by a wife, with regard to a divorce suit
pending against her, in the course of a conference on the subject at
which the husband is present, are privileged so far as concerns testi-
mony sought to be elicited from the attorney in an action to which
neither the husband nor the wife is a party.

3. SAME. An attorney cannot be required to testify concerning communi-
cations made to him in that capacity, notwithstanding no objection is
made by the client, who, not being a party to the litigation or present
at the trial, has no opportunity to consent or to object to the testimony.

4. SAME—*Statement of Coroner as to Cause of Decedent's Death Inad-
missible.* A report filed with the county clerk by the coroner stating
that he found a death to have resulted from a wound inflicted with
suicidal intent and that a formal inquest was unnecessary, is held
not to have been admissible as evidence of suicide.

5. SAME—*Appearance of Gunshot Wound—Competent Witnesses.* The
evidence of the qualification of several witnesses to give opinions as
to the probable distance at which a shot was fired, as indicated by the
appearance of the wound, is held to have been sufficient to render their
testimony on the subject admissible.

6. SAME—*Presumption Against Suicide—Instruction.* The contention
that an instruction given in relation to the presumption against suicide
was likely to have misled the jury, is held not to be well founded.

7. NEW TRIAL—*Newly Discovered Evidence—Insufficient Showing.* Upon
the hearing of a motion for a new trial on the ground of newly dis-
covered evidence, to be given by one known to have had first-hand in-
formation concerning the matter in controversy, the failure to call the
witness at the trial is not excused by the fact that the attorneys for
the losing party had been told that the proposed new witness was un-
friendly to their cause and therefore believed that such witness would
be produced by the other party.

Appeal from Wilson district court; SHELBY C. BROWN, judge.
Opinion filed May 7, 1921. Affirmed.

*E. D. Mikesell,* of Fredonia, *George J. Mersereau,* and *Manvel H. Davis,* both of Kansas City, Mo., for the appellant; *Gardiner Lathrop, Thomas R. Morrow, John M. Fox,* and *Samuel W. Moore,* all of Kansas City, Mo., of counsel.

*D. J. Sheedy,* and *J. L. Stryker,* both of Fredonia, for the appellee.

The opinion of the court was delivered by

MASON, J.: In April, 1919, James Madison O'Brien insured his life in favor of his mother, Elizabeth O'Brien, the policy providing that there should be no liability thereon if within a year the insured should die by his own act. He was killed by a bullet from a pistol on August 8, 1919. His mother brought this action against the insurance company. A defense was made upon the ground that the insured had committed suicide. A jury trial resulted in a verdict and judgment for the plaintiff and the defendant appeals.

1. The principal question involved is whether there was any substantial evidence to support the finding that the death resulted otherwise than from the voluntary act of the insured. Witnesses testified to these facts:

O'Brien was living on a farm with his wife and their three-year-old daughter. A Mrs. McCain worked for them. The house had four rooms, two upstairs and two down, the stairway being in a hall between the two downstairs rooms. On the night of August 7 one of the upper rooms was occupied by O'Brien and his wife and the other by a neighbor, Ben Beck. One Ray Smith also stayed at the house over night. Early the next morning O'Brien was called to the telephone by a friend who asked for his help in threshing. O'Brien answered that he would come. O'Brien also called another neighbor and asked him if he could send a man to help thresh. The neighbor told him he could and also asked if O'Brien could help him hay the next week, receiving an affirmative answer. Twenty minutes later—a little before six o'clock—while Beck and Smith were standing just outside the front door and O'Brien's wife and Mrs. McCain were in the kitchen, they heard a shot. Mrs. O'Brien ran upstairs and screamed. The others followed her. O'Brien was lying on his back on the bed in which he and his wife had slept, the mattress resting directly on the floor. He

struggled somewhat but said nothing and died almost immediately. A 32-caliber revolver, empty except that one chamber contained the shell of a discharged cartridge, lay on the floor about a foot from his right hand. He was in his stocking feet, and over light underwear wore a suit of unionalls which were unbuttoned at the top for a distance of something less than ten inches. A bullet had entered his breast near the heart and ranged straight back, passing through the body and lodging just under the skin. It had passed through the undershirt but not through the unionalls. There were powder marks upon the undershirt but the body was free from them, or nearly so. The wound was clear cut, not torn, the flesh not being burned or bruised. O'Brien had filed a suit for divorce on the ground of unfaithfulness a few months before his death but a reconciliation had been effected, and he and his wife had been living together for over a month. Their relations the night before the tragedy were pleasant and affectionate—he seemed to be very happy. O'Brien's disposition was cheerful—he was always jolly and lively. He owed $1,250 for an automobile, secured by a lien on the car and a chattel mortgage on 500 bushels of wheat. He had been sued on a claim for $110, but had said the suit wasn't bothering him.

Three witnesses who were sufficiently qualified as experts to render their opinions admissible testified that in their judgment the appearance of the wound and clothing indicated that the revolver was not close to the body when it was discharged, but at a distance estimated severally at two to four feet, two to two-and-a-half feet, and fifteen inches to two-and-a-half feet.

We think the evidence justified submitting to the jury the question whether or not O'Brien committed suicide. They were warranted in finding, and must be deemed to have found, that his domestic trouble had been completely remedied; that his owing $1,250 on his automobile and having been sued for $110 indicated no serious financial difficulties; that he was of a cheerful disposition and that there was nothing in his character, condition or surroundings to suggest a desire to end his life. One witness testified that in the course of a quarrel with his wife about a week before his death he had threatened to kill himself, but as the jury may not have given credence to

O'Brien v. Insurance Co.

the testimony it does not affect the solution of the problem to be now determined. In view of these considerations the conclusion as a matter of law that O'Brien committed suicide can only be reached by the process of elimination—by deciding that the established physical facts concerning his death necessarily exclude any other reasonable hypothesis.

The weight to be given to the opinion evidence as to how far the revolver was from the body when the shot was fired was a question for the jury. They may have been satisfied that the distance was not less than two feet. It is manifestly unlikely that if O'Brien intended to kill himself he would hold the revolver so far away. On the other hand the fact that the bullet passed straight through the body indicates a position of the revolver that does not readily lend itself to the theory of its accidental discharge by being carelessly handled or dropped, or by its hanging fire. The weighing of these conflicting probabilities however was a function of the jury. In order to reach a verdict for the plaintiff it was not necessary for them to find that the death occurred in any particular manner, but merely that they should fail to be persuaded by a preponderance of the evidence that it was the result of a suicidal intent. The case has something in common with earlier ones in which juries have found against the theory of suicide where the circumstances were capable of interpretation tending forcibly to the contrary. (*Heath v. Life Association,* 89 Kan. 634, 132 Pac. 147; *McCoy v. Insurance Co.,* 104 Kan. 571, 179 Pac. 969.) The circumstances presented are quite similar to those of *Stephenson v. Bankers Life Assn.,* 108 Ia. 637. There a verdict implying that a death was accidental was upheld against the contention that the evidence did not support it. In the opinion it was said:

"There were very slight powder marks, if any, about the wound, and there was no laceration. It was a clear cut. . . . It is evident that the revolver was not held against the head, as is usual in cases of suicide. . . . While some of the circumstances point towards self-destruction, yet we cannot say that the evidence is sufficient to overcome the presumption of accident. The most that can be said is that they point as strongly in one direction as the other; but this, as we have seen, is not sufficient, for the reason that plaintiff's case is aided by a presumption based upon the love of life found in every individual, which is ordinarily sufficient to induce its preservation." (pp. 640, 641.)

O'Brien v. Insurance Co.

2. At the trial the defendant called as a witness the lawyer who had represented O'Brien's wife in connection with the divorce action and offered to prove by him statements made in the course of a conference between himself and the parties relating to a settlement of their difficulties. The offer was rejected on the ground of privilege and this ruling is complained of. If the witness is to be regarded as having acted as attorney for both parties their communications although admissible in a controversy between each other, would be privileged from disclosure at the instance of a third person in an action to which neither of them was a party. (4 Wigmore on Evidence, § 2312; 4 Jones Commentaries on Evidence, § 751b.) Regarding the witness as the attorney for the wife alone the presence of her husband at the conference might prevent her statements from being privileged in litigation wherein the husband and wife were opposing parties, but, upon the same principle applied in the cases covered by the citations just made, it would not enable a stranger to require the attorney to reveal what his client had said. It has often been said broadly that statements made to an attorney by his client in the presence of the adverse party are not privileged. (40 Cyc. 2377.) However, in the cases cited in support of such expressions, either the testimony of the attorney was called for in litigation between his client and the opponent who had been present when the communication was made (or their representatives), or else the distinction was not noted between that situation and one where a stranger sought to elicit the testimony. The rule has more accurately been thus stated (the italics being ours except as to the first italicised phrase), the language being in part adopted from that of the opinion in *Britton v. Lorenz*, 45 N. Y. 51, 57:

"A communication between client and attorney is not confidential when made in the presence of the *other party*. Where it is made in the presence of all the parties to the controversy, evidence of the communication is competent *between such parties*, and the attorney may be required, *in an action between them*, to testify thereto." (4 Jones Commentaries on Evidence, § 751b, p. 507.)

There is no room for presuming that statements made to his attorney by one party to a divorce action in the presence of the other in the course of a conference looking to an adjustment of the controversy are not intended to be confidential. That situation is peculiarly one in which public policy favors encourag-

ing the fullest freedom of utterance. Upon these grounds we regard what O'Brien's wife said to her attorney as privileged. Whether or not the privilege would extend to statements made by O'Brien is not important because they were so interwoven with those of his wife as not to be capable of a separation that would have enabled material light to be thrown upon the present case without violating the wife's rights. Indeed the facts sought to be brought out by the attorney's testimony were substantially supplied by the divorce petition and other evidence.

3. The defendant suggests that the testimony of the attorney should have been admitted because the privilege involved was that of O'Brien's wife, who made no objection to it. It is sometimes said that only the client can invoke the privilege, but the obvious meaning is that if the client has an opportunity to object to the testimony and does not do so this may be regarded as a waiver and no one else can raise the issue. "Where the client or patient, being in a position to assert his privilege, declines to do so, the attorney or physician cannot refuse to testify; but where an attorney is interrogated as to confidential matters between himself and his client and the latter is not in a position to either assert or object to the testimony, it is the duty of the attorney to assert the privilege and decline to answer unless directed or permitted by the court to do so." (40 Cyc. 2395. See, also, *Rex v. Withers,* 2 Campbell's Reports, 578; *Hodges v. Millikin,* 1 Bland's Ch., 503, 509.)

4. No coroner's inquest was held, but the coroner, after looking at the body and hearing the unsworn statements of witnesses, filed with the county clerk a report to the effect that he found that O'Brien had committed suicide and that a formal inquest was unnecessary. The defendant offered this report in evidence and complains of its rejection. There is a difference of judicial opinion as to when and for what purposes the result of a coroner's inquest may be admitted in evidence. (3 Wigmore on Evidence, § 1671, p. 2078; *Allen v. Knights and Ladies of Security,* 108 Kan. 419, 195 Pac. 616.) Whether or not the verdict of a coroner's jury would be admissible in such a case as the present upon the issue of the cause of death, and whether or not a report of the kind here offered might in any circumstances be competent upon that issue, the ruling of the trial court was clearly correct. The report amounted to no more

than a statement of the opinion that had been formed by the coroner at the time of the death. The jury could have gained from it no new information as to the facts in the case. They had the benefit of the sworn testimony of witnesses, including the coroner, as to what first-hand knowledge of the subject each had and the situation was not one where opinion evidence was necessary or admissible.

5. The competence of the witnesses as to the distance of the revolver from the body when the shot was fired, as indicated by the appearance of the wound, is challenged on the ground that their evidence did not show them to be qualified as experts on the subject. According to the testimony one of them had had much experience with firearms; had been in national pistol competitions; had had three years' experience with the regular army and national guard in the service and about ten years' "where tests were made with firearms and effects." Another was a physician who had been an officer in the late war in the medical department; he had been called upon to examine gunshot wounds, to determine whether or not they were self-inflicted, and had had some slight instructions with reference to that matter. The third was a captain of infantry in the late war and was overseas; he was familiar with wounds caused by the use of revolvers. We think the evidence of qualification was sufficient to make the testimony admissible. The subject was one concerning which the opinions of persons who had had considerable experience might be of more value than those based merely upon general knowledge. The jury must be presumed to have considered the extent of the experience of the witnesses in determining what weight should be given their evidence.

6. The court included in its charge a quotation from the syllabus in *Mutual Life Ins. Co. v. Wiswell,* 56 Kan. 765, 44 Pac. 996, reading: "Where the evidence as to the death being accidental or suicidal is so nearly balanced as to leave the question in doubt the presumption is in favor of the theory of accidental death." (¶ 2.) The existence of a presumption against suicide on the part of a sane person is generally recognized. (22 C. J. 95; 1 Enc. L. & P. 419.) The defendant however regards the language quoted as likely to have misled the jury by causing them to believe that the presumption against suicide

should control unless the evidence proved the contrary beyond all doubt. We do not think that it is fairly open to that construction, or that there is any reasonable likelihood that it was so interpreted by the jury. The word presumption is sometimes used as a procedural term, allied to the burden of proof. The so-called presumption against suicide in such a case as the present, where the issue must be determined from circumstantial evidence—by the balancing of probabilities arising from the established facts—is perhaps better described as an inference to be drawn from the universally recognized fact that the instinctive love of life is strong in the normal person. It is a matter to be considered with others in arriving at the most probable solution of a question which cannot be determined with absolute certainty. The jury were also told in substance that they should take into consideration the condition of O'Brien in life—his domestic and social relations, his financial circumstances, and his state of mind—and if they believed from a preponderance of the evidence that he committed suicide they should return a verdict for the defendant. We find no ground for reversal in the instruction complained of.

7. A new trial was asked on the ground of newly discovered evidence and complaint is made of its denial. The new evidence relied upon is that of O'Brien's wife with reference to his domestic relations, financial and physical condition, and to the occurrences on the morning of his death. The explanation offered by the defendant for not having called this witness at the trial is that its attorneys had been told by Mrs. McCain that O'Brien's wife had come to her residence and told her in case any of the people from the insurance company came to her with reference to her husband's death to be sure and say it was accidental and not suicide, which led them to believe that her evidence would be produced by the plaintiff. We do not regard this as a sufficient excuse on the part of the defendant for not investigating further and calling the witness if her testimony proved desirable. It follows that no error was committed in denying the motion, irrespective of whether her evidence was such as in any event to justify granting a new trial. One passage from her affidavit as to what her testimony would be reads: "For about a month before Jimmy killed himself, he got so that every time he would get mad or out of sorts about

something he would go upstairs and get his revolver and shoot. He would sometimes shoot out the window and at other times would shoot at pictures on the wall." This had no important bearing upon the motion for a new trial, but may serve to explain the fact brought out at the trial that when the fatal shot was heard Ray Smith said: "There goes Jimmie shooting that damned old 32 again," implying that such an occurrence was not regarded as unusual.

The judgment is affirmed.

BURCH, J., and PORTER, J., dissent from the first paragraph of the syllabus and the corresponding portion of the opinion.