No. 23,456.

BESSIE DEWEESE, *Appellee,* v. WOODMEN OF THE WORLD, *Appellant.*

SYLLABUS BY THE COURT.

FRATERNAL INSURANCE—*Insured a Suicide—Certificate Forfeited.* The evidence all pointed to suicide of the person insured by the policy sued on herein, and was such that no other reasonable conclusion could be drawn. *Held,* error to refuse a directed verdict for the defendant.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed February 11, 1922. Reversed.

*George R. Allen,* of Kansas City, for the appellant.
*Charles O. Littick,* of Kansas City, for the appellee.

The opinion of the court was delivered by

WEST, J.: This action was brought on a policy of insurance. The plaintiff recovered and the defendant appeals. The only question is whether or not the evidence so plainly showed suicide as to require an instructed verdict for the defendant.

The deceased was under thirty, a healthy, cheerful man, and about completing a bungalow for his family, when the end came. He was found about nine o'clock in the forenoon in this bungalow hanging by window cord suspended from a rafter, his feet about eighteen to twenty-four inches from the floor. Life was extinct but

Deweese v. Woodmen of the World.

his body was still warm. There were neighbors and houses in the vicinity, the nearest house being about three hundred feet away. No explanation is found in the abstract or counter abstract as to how murder could have been committed. The jury, however, returned the following:

"Was the death of Luther E. Deweese caused by hanging? Answer, Yes.

"If you answer Interrogatory No. 1 'Yes' then state if death was caused by his own act or hand. Answer, No.

"If you answer Interrogatory No. 3 'No' then state what you find other than his own act or hand did cause death. Answer, Homicide."

The defendant requested the following instruction which was refused:

"You are instructed that under the evidence in this case it is conclusively shown that Luther E. Deweese, deceased, came to his death by his own act or hand, commonly called suicide, and, under the provisions of the contract of membership existing between himself and the defendant fraternal beneficiary association, his certificate was forfeited and plaintiff cannot recover in this action. Your verdict must, therefore, be for the defendant."

In order to decide the question presented it is necessary to state in substance the evidence touching the death. The widow testified that they intended to move into the new house the week following the death; that there had been no domestic trouble of any kind or any family tilt the morning the deceased went to his work; that he had no financial troubles and had arranged for money necessary to build the house, and when he left home on the morning of July 18, for his work he had less than fifty cents with him; that she never heard of any insanity in his family.

A sister of the deceased testified that he was twenty-seven years old when he died; that the house he was building was a five-room, one-story bungalow in a built-up neighborhood, one house across the street north, and one across the street west, and that she saw nothing unusual in his face, actions or mental condition when she saw him last on July 6; that he belonged to a brakemen's union and had worked at Armour's about six weeks and quit because he would be required to join the union if he stayed there and decided not to stay there and quit and build a house for himself, and later went to work at Proctor's where "it wasn't union." That he said he had to either join the union at Armour's or quit work, and he decided to quit. That this was the reason he did quit.

A carpenter testified there were no other houses in the same block except a shed in the back where cement was kept; that the

joists were two by four and a little over fourteen inches apart; that the ceiling joists were eight or eight feet two inches from the floor; that the deceased weighed about one hundred sixty-five, and was five feet and ten or eleven inches tall; that while he worked there, the deceased was interested in the work and anxious for the house to be completed and move in and did not appear morose or melancholy; that it would be possible for a man of the deceased's build to drop down between two joists. "It would be possible, but hardly probable that he would fall through without hitting a joist." The rafters were two feet apart.

A neighbor testified that he heard the deceased around on the inside of the house about 9:15, and a neighbor called across that there was a fellow hanging over there in the house, whereupon he went over and saw the deceased hanging there "probably three foot from the west partition and three foot from the north partition, hanging by a sash cord about the size of your thumb, fastened to a rafter at the top coming down between two ceiling joists, and around the neck of the deceased in the shape of a noose." The body was still warm and the witness saw a little book taken from the hip pocket of the deceased in which was a pencil and there was some writing and other figures in the book. The writing was—"Dear Bessie: Don't take any more expense at my funeral than necessary. Take care of the children. Trouble and worry caused this. Goodbye." Below that it said: "Notify my wife, Mrs. Bessie Deweese, 367 South Tenth Street." The house was about three hundred feet distant and in clear view of the home of the witness, and there was no one else around there.

The wife of the witness last named testified that the Deweese house was in the block, three hundred feet west of their house and she frequently heard him singing about this work and that people called in to see how he was getting along with the house, but she did not recall seeing anyone around there except Deweese in the morning before he was found dead, and she heard no unusual noise.

The city clerk of Kansas City testified that somewhere between nine and eleven o'clock he went to the house with Sergeant Evans of the police department and found the body hanging by a rope such as is used in hanging window weights, and his feet were about eighteen inches or two feet from the floor. The sergeant found in

Deweese v. Woodmen of the World.

the pocket a book with a note scribbled in it and the witness read and copied it for the sergeant. The note read as follows:

"Notify Mrs. Bessie Deweese, 367 South Tenth Street. Please don't take much expense with my burial. Good-bye, and take care of the children. Trouble and worry caused this.                    LUTHER DEWEESE."

He examined the body carefully and found no bruises or marks of violence. It was fully clothed and there was no indication that death had been caused in any way except by hanging. There were some neighbor women around in front of the house talking about the matter, and three or four men and boys, and one of them a negro, looking in at the window.

The coroner testified that after a careful examination of the hands, face and body to ascertain if there were any marks of violence besides the condition of the neck, he found no other abnormal condition, and found that death was caused by a broken neck from hanging. He did not hold an inquisition for he found no evidence of crime and did not think it necessary. The neck was broken.

The police sergeant testified:

"When you went out there, Sergeant, did you make any examination of the body to see whether there was any marks of violence other than the red around the neck? Was there anything wrong with the head or face or hands. A. There was nothing about the body that caused us to believe anything but that he had hung himself."

Neither Mrs. Deweese nor any other person, so far as witness knew, had ever made complaint to the police department for any investigation or search into the cause of death other than was made by witness.

Mary Stewart testified that she lived across the street north. She worked around the house and heard Mr. Deweese singing and whistling doing his work during the morning; she saw no one else around the house and heard no outcry of any kind.

A merchant who had known the deceased for fourteen years testified that he did not seem morose but was just a lively, hard-working young man; he was not a drinking man and there did not appear to be anything wrong with his mind. Never heard of any bad habits.

The deceased had a piece of old rope or sash cord about five feet long which he used to draw water from a spring and also to carry his tool chest. On the morning of the 18th he took no rope with him when he went to work. A witness said she saw a rope being taken

away but could not see whether it was the rope which the man was swinging to; that she saw a man take a rope but could not see whether it was the one the deceased was hung with or not. The rope was taken away about half an hour after the body was cut down. Mention is made of this rope testimony because emphasis was placed on it in the argument.

With the rules and decisions invoked as to love of life, the province of a jury, the inference to be drawn from testimony and circumstances, and the likelihood of men coming to different conclusions, we are quite familiar. But brief reference will be made to recent decisions in cases involving somewhat similar questions. In *Mutual Life Ins. Co. v. Wiswell,* 56 Kan. 765, 44 Pac. 996, the evidence of accidental or suicidal death was held to be so evenly balanced as to leave the question in doubt. The deceased, a ministerial student, overworked, was adjudged insane and committed to the asylum, recovered and was discharged. He suffered from insomnia and took powders to produce sleep. He was discovered in an unconscious condition in his room in the afternoon and died about half past nine that evening. In *Heath v. Life Association,* 89 Kan. 634, 132 Pac. 147, while there was evidence of suicidal motive, there was also a showing that the deceased had just been arrested charged with rape on a young married woman whose husband had threatened to kill him, and had tried to get a gun and ammunition for the purpose. The deceased was found with his throat cut, and a razor was found in the closet, but was one that had never been in the house before.

In the Perkins case it was said:

"The appellant contends that there is a presumption that a rational person will not commit self-destruction, and that this presumption must be overcome by evidence. This is settled law. . . . But there was evidence which, in the opinion of the district court, was sufficient to overcome that presumption and to base a finding of suicide. It can avail naught that this court might think the evidence rather meager to warrant that conclusion." (*Perkins v. Accident Association,* 96 Kan. 553, 554, 152 Pac. 786.)

In *McCoy v. Insurance Co.,* 104 Kan. 571, 179 Pac. 969, the body of the deceased was found lying flat on the back with the arms extended, the right arm extended out. There was a wound by the right ear something like a powder burn, and there was something dark on the left hand, on the front side of the index finger pointing to the thumb. A shot gun was across one leg and there was some blood on the right side of the waist. The deceased's hat lay about

six feet from the body, and there was a gunshot wound in the head, the shot having entered on the right side. There were other circumstances strongly pointing towards suicide, the sheriff showing that suicide could be possible, but the jury concluded that the death occurred from accident, and the verdict was left undisturbed, three members of the court dissenting. In *O'Brien v. Insurance Co.*, 109 Kan. 138, 197 Pac. 1100, the most recent of these decisions, the company claimed suicide, but the jury found against the defendant and the finding was sustained, two of the justices dissenting as to the question of suicide. The deceased was found lying on his back on the bed after a shot was heard, he struggled somewhat but said nothing and died almost immediately. A 32-caliber revolver, empty except the one chamber that contained the shell of a discharged cartridge, lay on the floor about a foot from his right hand. A bullet had passed through his body, and there were powder marks upon the underclothing. The wound was clear-cut, not torn, the flesh not being burned. He had recently filed a suit for divorce against his wife, but a reconciliation had been effected and they were living together, their relations just before the tragedy being pleasant and affectionate. He was cheerful and lively. It was held that evidence submitted to the jury justified the decision that the deceased did not commit suicide.

*Power v. Modern Brotherhood*, 98 Kan. 487, 158 Pac. 870, involved a policy with the usual clause that the certificate should be void in case of suicide, sane or insane. Power was about forty years of age, a boilermaker. His family consisted of himself, his wife, mother and a four-year-old daughter. He and his wife had attended the funeral of a brother lodge member and had gone home on the street car, his wife reaching home first and was getting supper. Soon after entering the house he took up a letter having something to do with his lodge insurance. He told his wife that the rate of his insurance had gone up and that his policy was only for a $1,000 instead of $2,000. She told him he was mistaken and he asked her to come and tell him how she figured it. She told him she was busy. He grew angry, swore at her and threatened to do her violence. His wife went into the yard where his mother was.

"Power went into the bedroom, got his revolver, and followed his wife into the yard, cursing her. He tried to coax her into a shed but she would not go, and he held the revolver near his wife's face. She threw her hand up and

knocked it aside. . . . He stooped down, kissed the little girl and told her 'she would not have any papa any more.' " (p. 488.)

He told his wife to go into the house and she refused unless he would put the gun away.

" 'He was still cursing and crying, called me a liar, foul names, and threatened to knock my head off. After two or three minutes he went into the house. His mother entreated him to hand her the gun but he refused and went into the house and locked the screen door. In less than a minute I heard two shots close together. I forced the screen door open and rushed into the house and found my husband lying on his back on the bedroom floor, blood spurting out from a hole in his temple, mouth wide open, eyes rolling, gasping for breath and gun tightly clasped in his right hand.' " (p. 489.)

It was held that the deceased shot himself with a pistol but that his death was the result of suicide. In the opinion it was said:

"The facts, about which there is not the slightest dispute, show that the deceased shot himself in the head with a revolver with the declared intention of killing himself. There is no room for quibble as to the inference to be drawn from the facts." (p. 493.)

The theory of the plaintiff is that owing to some labor trouble or unknown enmity Deweese was hung by murderous hand. While it is true that there is much to indicate the absence of suicidal intent, it is equally true that there is nothing whatever to indicate murder. Murder here must necessarily involve at least two strong men going into the house and in someway overpowering the deceased, getting a noose around his neck, raising him, suspending him from a rafter and then pushing him from the joist so that the body would be suspended between it and the next with sufficient force to effect death. Unless possessed of superhuman strength no man and no two men could perform this Herculean task unseen and undiscovered. The rope used by the deceased to draw water and carry his tool chest was not the one used to hang him with, and that some one was seen carrying away a rope about half an hour after the body was cut down is without material significance. The presumption that a sane man would not commit suicide is strong enough to overcome many divers circumstances, but here we have simply the one fact and the one condition: The fact of death by hanging and the condition of the practical impossibility that such death could have been caused by anyone but the deceased.

Jurors are not to be permitted to shut their eyes to what everybody else sees and understands and wander off into fields of imagi-

Deweese v. Woodmen of the World.

nation and suspicion in order to reach verdicts. Courts are more and more realizing and declaring that they must not permit themselves to be more ignorant than anybody else or fail to see what is plain to everyone and everybody except a court. There was nothing in the testimony that could be a basis or handle for supposing some undisclosed means of death. The facts seem to have been fully and fairly presented, and but one sensible or reasonable conclusion was or is possible to be derived therefrom.

This conclusion is not only in accordance with our own decisions already referred to and in perfect harmony with them, but it is abundantly sustained by decisions of numerous other courts.

The Mississippi Supreme Court in *Knights of Honor v. Fletcher,* 78 Miss. 377, said:

"We think the evidence of intentional self-murder, on the case shown by this record, overwhelming. . . . The pressure of the evidence for the defendant excludes all but conjectures of the most imaginative type of possible accident or murder from another hand, and the plaintiff cannot split up the loose joints of mere conjecture with even plausible possibilities, and these the law does not require the defendant to negative in proof." (pp. 388, 389.)

Johnson, J., speaking for the court in *Newland v. M. W. A.,* said:

"Where the evidence of suicide is undisputed and is so strong that the opposite conclusion could not be said to have an evidentiary foundation but would be the product of mere conjecture or whimsical deduction, there is no issue to go to the jury." (*Newland v. M. W. A.,* 168 Mo. App. 311, 319.)

In *Agen v. The Metropolitan Life Ins. Co.,* 105 Wis. 217, it was held:

"Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the trial court as one of law." (Syl. ¶ 5.)

The same court in *Hart and others v. Fraternal Alliance,* 108 Wis. 490, said:

"These facts, coupled with the admission of suicide in the proofs of death, were so conclusive that the court should have granted defendant's motion for direction of a verdict. The verdict rendered was founded on mere speculation and is against every reasonable probability in the case." (p. 495.)

In view of the foregoing the judgment is reversed and the cause remanded with directions to enter judgment for the defendant.