No. 33,955

Eula Malone, *Appellee*, v. The New York Life Insurance Company, *Appellant*.

(83 P. 2d 639)

Opinion filed November 5, 1938.

*J. S. Simmons, Alva L. Fenn* and *Herbert E. Ramsey,* all of Hutchinson, for the appellant.

*Charles M. Tucker, Charles Vance* and *H. A. Gaskill,* all of Liberal, for the appellee.

The opinion of the court was delivered by

Thiele, J.: This was a suit to recover on a double liability provision of a life insurance policy, and from a judgment for plaintiff the defendant appeals. Although the overruling of its motion for a new trial is specified as error, the specifications more particularly relied on consist of claimed errors in the admission and exclusion of evidence and in instructions to the jury.

For our purposes it is sufficient to say that one Harry R. Malone, son of the plaintiff, had a life insurance policy in the defendant company which provided for double indemnity if his death occurred from bodily injury through accidental means and not from self-destruction. On November 7, 1936, Harry R. Malone was killed by the discharge of a shotgun. Proofs of death were made, and by agreement the company paid the principal sum due, and the action was brought solely to determine the defendant's liability for the additional amount of the claimed double liability.

The company's defense was that the death of the insured was not accidental, but that he committed suicide.

There is no dispute that the insured, although a married man, was living with his parents at the time of the tragedy. The parents had been out at a social gathering, and returning home late, the father saw his son's body lying across the bed in his room. He closed the bedroom door and called the coroner, who arrived shortly, and a doctor was then called. The son's body was across the foot of the bed, his feet were on the floor and he was holding an automatic shotgun with his right hand possibly six or seven inches below the muzzle. He was fully clothed except for his coat. A charge from the gun had entered his head on the right side just above and in front of his ear and passed out through the top of his head. Where entering, the opening was slightly oblong up and down and about the width of a quarter coin and there were powder burns completely around the wound. There was evidence the insured was right-handed.

The real question was whether the insured had committed suicide or had been accidentally killed, and that depended on whether the gun had been purposely or accidentally discharged. It was important to show whether, taking into consideration the position and condition of the wound, its size, the course of the shot, etc., the insured could have held the barrel of the gun with his right hand and discharged it with his left.

Each of the doctors hereafter mentioned saw and examined the body of the insured. In addition to their medical testimony, concerning the competency of which there is no dispute, Doctor Morgan and Doctor Hilbig testified with reference to their personal familiarity with shotguns, the size of a hole the discharge would make at varying distances, the spread of the charge, etc. Doctor Mays stated he was familiar with the operation of shotguns; that he had made no especial study of gun-shot wounds, or the effect thereof, but that he had heard some discussions thereon at clinics and medical meetings; that he had practiced medicine for twenty-eight years, and had had occasion as a physician to examine and treat gun-shot wounds and powder burns. Doctor Morgan and Doctor Mays were permitted to give their opinions as to the distance the gun was from the head at the time of the discharge, the distance stated being from ten to fourteen inches, and Doctor Hilbig and Doctor Mays were also permitted to give their opinion that it was not possible for the insured to have held the gun with the right hand six inches below the muzzle and to reach the trigger with the left hand to cause the wound in the insured's head. Appellant objected to this evidence being admitted, and argues that its admission was prejudicial error.

The whole question may be said to center around this: The facts as to the wound had been shown, also the position of the gun with relation to the insured's right hand, and that he was right-handed and therefore it was an invasion of the province of the jury for any witness, expert or otherwise, to state the conclusion the insured could or could not hold the gun as indicated heretofore and discharge it.

Distinction between facts and conclusions was involved in *Bank v. Robinson*, 93 Kan. 464, 144 Pac. 1019, and it was there said:

"The modern notion of the admissibility of evidence is that it is more important to get the truth than to quibble over impractical distinctions between facts and conclusions." (Syl. ¶ 2.)

See, also, *Robertson v. Robertson*, 100 Kan. 133, 135, 163 Pac. 655; *Smith v. Prudential Ins. Co.*, 136 Kan. 120, 124, 12 P. 2d 793.

Many authorities are cited in the briefs, and a reference to them and others available shows the complexity of the matter. The general rule is that the normal function of the witness is to state facts within his personal knowledge, and that ordinarily his opinions and conclusions are not to be received. (See 22 C. J. 485, where many Kansas cases are cited.) However, it is recognized that a skilled witness is permitted to state facts known to him because of his special knowledge and experience or his inferences therefrom where the matter involved is such that persons without his special knowledge could not observe intelligently or draw correct inferences, although admission of such evidence has been criticized (22 C. J. 498). While in its argument appellant limits the question of admissibility of the opinion evidence to the witnesses' qualification as experts on firearms, we have some difficulty in separating that from their qualifications as physicians. Whether the gun was up against the head or some distance removed from it was in part discernible from the wound, the powder burns, the effect on the bone structure, etc., and from this aspect the matter was in part medical. And that a physician's experience and training might lead him to know that a gun was close to or some distance away from its human target might well be within the range of a doctor's knowledge, although he had never handled or fired a gun, would seem apparent.

In *O'Brien v. Insurance Co.*, 109 Kan. 138, 197 Pac. 1100, plaintiff sought recovery on a policy where the insured was killed by a revolver shot. The company alleged death was by suicide. There it was held:

"The evidence of the qualification of several witnesses to give opinions as to the probable distance at which a shot was fired, as indicated by the appearance of the wound, is held to have been sufficient to render their testimony on the subject admissible." (Syl. ¶ 5.)

In *City of Parsons v. Lindsay*, 26 Kan. 426, a part of the syllabus recites:

"As a general rule the opinions of witnesses are not competent, although such opinions may be derived from the witnesses' personal observation, and are sought to be given in evidence in connection with the facts on which they are based. To this rule there are some exceptions. In matters relating to skill or science, such persons as have had sufficient experience, or who are possessed of sufficient knowledge, and who are usually denominated *experts,* may give their opinions, whether they are personally cognizant of the facts or not. There are also some exceptions, seemingly founded upon convenience or necessity, and relating to such matters as involve magnitudes, or quantities or portions of time, space, motion, gravitation, or value, and as involve the condition or appearance of objects, as observed by the witness, and matters which, from their limitless details, and the infirmity of language and memory, cannot well be stated by the witness, except in the form of an opinion." (Syl. ¶ 1.)

This holding has been repeatedly followed, one of the later statements being in *State v. Scott,* 117 Kan. 303, 321, 235 Pac. 380.

Under the circumstances of this case, it was obviously impossible for the jurors to see the deceased, to observe his physique, the appearance of the wound, etc. It seems likewise apparent that ordinary use of language could hardly have conveyed to the jury what the doctors who had examined the insured observed; and to an extent, at least, statements as to what they observed would be conclusions. We are of the opinion that the trial court did not err in holding the witnesses had been properly qualified and that the admission of the evidence complained of did not constitute reversible error.

Appellant also insists the trial court erred in allowing two witnesses to testify that the night before the tragedy they had conversations with the deceased in which he said he was going hunting the next morning. It is said the conversations were hearsay. It may here be noted that previously there was testimony that deceased kept his hunting clothes in a certain closet and when the parents left the house they were not out in decedent's room. When the body was found, the hunting clothes were on a chair in his room.

It has been said that the theory of the rule against hearsay is that when the utterance is offered as truth of the fact asserted, the credit

of the assertor becomes the basis of inference and therefore can be received only when the assertor is on the stand and subject to cross-examination, but that if the utterance is offered, not as an assertion to evidence the matter asserted, but without reference to its truth, the rule does not apply. (See 3 Wigmore on Evidence, 2d ed., p. 770, § 1766. See, also, *Bank v. Hutchinson*, 62 Kan. 9, 17, 61 Pac. 443; *Mills v. Riggle*, 83 Kan. 703, 112 Pac. 617.) In this case the issue was not whether the insured was going hunting, it was whether he had been accidentally killed or had committed suicide. Evidence as to the place where his hunting clothes were usually kept, where they were found, and what he had said about going hunting was competent as showing his state of mind. It is conceivable that even though the evidence showed rather strongly he could have inflicted the fatal wound, it still could have been accidentally inflicted, and whatever circumstances could be shown that would tend to prove or disprove a possible motive or intention were properly received in evidence.

In its defense, the appellant called as a witness an army officer who qualified as an expert on firearms. After many preliminary questions which need not be reviewed, in answer to a hypothetical question, the witness stated that in his opinion the most probable position of the gun muzzle was that its lower ring was touching the insured's head at the time of the shot. He also stated that if the hole in the wound was three quarters of an inch in diameter the muzzle was practically touching the head. He further stated that a person as tall as he (the testimony showed that insured and witness were about the same height) could hold the gun against the head with the right hand holding the muzzle as indicated and reach the trigger with his left hand, and he described how he had done it. He was also permitted to testify as to experiments made by him with the particular shotgun as to how it loaded, unloaded, whether it would accidentally discharge, etc., and that he had tried to make it discharge by jar or bump on the floor and that it would not do it. During the course of the examination, the witness was asked to demonstrate how he could hold the gun so that the trigger could be discharged and also to demonstrate the gun could not be discharged by striking it on the floor. The trial court refused to permit the demonstrations. Appellant insists vigorously that this was error and directs our attention to many decisions and authorities bearing on the question. It recognizes, however, that whether the demonstra-

tion should have been permitted rested largely in the discretion of the trial court. (See 22 C. J. 789, 10 R. C. L. 1000.) Insofar as both matters were concerned, the witness had testified fully, first that he could operate the trigger of the gun with his left hand, and second that he could not make the gun discharge by striking it on the floor. As to his holding the gun in his right hand and discharging it with his left, his testimony clearly showed that to do so the muzzle must be against, or practically against, the right side of his head. A demonstration would not have aided. As to discharging the gun by striking the butt on the floor, he had testified fully as to his experiments with it. While it would not have been error had the trial court permitted the demonstration, under the circumstances here we cannot say it abused its discretion.

Appellant argues the trial court erred in striking out an answer of the last-mentioned witness with reference to operation of the shotgun. After describing the method by which, after a discharge, the shell is ejected from the gun barrel, the witness was asked if it would be possible for the extractor to partially withdraw the shell. After stating that in his opinion it would not, the witness made an explanation. The answer was stricken out because the testimony was as to a shell which had been fired, and there was no evidence any such shell had been stuck in the gun. The ruling was correct. It may be noted that the only testimony on the subject was that on the evening before the tragedy a neighbor, Mrs. Shubring, saw insured with an opened gun which had a wet shell stuck in it, and he told her he would have to get it out before Sunday as he was going hunting that morning. That testimony was not offered to prove whether or not he was going hunting, but only to show mental condition. Refutation of whether or not there was a shell stuck in the gun was not material.

Another specification is that the trial court erred in refusing to admit the district court files in a divorce suit presumptively brought by the wife of the insured against him about a week prior to the tragedy. The abstract of the record shows merely that appellant sought to introduce the files, consisting of a petition alleging defendant to be guilty of gross neglect of duty and extreme cruelty, praecipe for summons, summons showing service, and a journal entry of dismissal because of the death of the defendant. Objection was made for other reasons and that there was no foundation laid. The trial court first reserved its ruling and after some further argument,

the nature of which is not shown, sustained the objection "for the present." There is no showing whatever that any effort was made to lay any foundation, to connect the defendant in that action with the insured, or to do aught that would tend to show that the assured was despondent or otherwise because the suit was brought. The trial court's ruling did not foreclose the defendant, it did not make any effort to make the files competent and it is not now in position to complain.

Appellant also contends the trial court erred in its refusal to give a requested instruction. The requested instruction was in part included in the instructions given. A portion dealing with circumstantial evidence was not given, and it is of this portion appellant complains. Appellee suggests that appellant did not request its instructions in the manner required by the code of civil procedure in that the requested instructions were not "reduced to writing and *signed by the party or his attorney asking the same,*" etc. (Italics ours.) (G. S. 60-2909.) Appellant concedes the request was not so signed. Under *Morisette v. Howard,* 62 Kan. 463, 468, 63 Pac. 756; *Farrar v. McNair,* 65 Kan. 147, 69 Pac. 167; *Railway Co. v. Wimmer,* 72 Kan. 566, 572, 84 Pac. 378, the failure to give the instruction requested is not reversible error. There is, therefore, no need to discuss the correctness, or lack of it, in the requested instruction.

The judgment of the trial court is affirmed.