SUPREME LODGE KNIGHTS OF HONOR *v.* JOHN M. FLETCHER, GUARDIAN.

#### ON MOTION TO DISMISS APPEAL.

1. APPEALS. *Insurance companies. Code* 1892, § 2330. *Laws* 1894, *pp.* 51, 52, *sec.* 2.

    The second section of the act 1894 (laws 1894, pp. 51, 52), amending code 1892, § 2330, in no way disturbs the right of appeal by an insurance company against whom a judgment has been rendered; it simply prohibits the company from doing business in this state unless it pays the judgment or prosecutes a supersedeas appeal within the time therein limited.

#### ON THE MERITS.

2. LIFE INSURANCE. *Suicide. Evidence. Verdict of coroner's jury.*

    In an action on a policy of life insurance, which by its terms was to be void in case the insured committed suicide, the finding of a coroner's inquest jury that the decedent committed suicide is admissible in evidence, and is *prima facie*, but not conclusive, of the fact found.

3. SAME. *Peremptory instruction. Conjectures.*

    A defendant in such a case ought not to be denied a peremptory instruction on the issue as to whether decedent committed suicide, to which it is otherwise entitled, by conjectures of an imaginary type of possible accident to or murder of the decedent by another.

FROM the circuit court of Attala county.

HON. WILLIAM F. STEVENS, Judge.

Fletcher, guardian, the appellee, was the plaintiff in the court below; the Supreme Lodge Knights of Honor, appellant, was defendant there. The plaintiff recovered in the court below, the judgment being rendered March 10, 1900, and it remained unpaid and unappealed from until September 25, 1900, when this appeal with supersedeas was sued out.

Section 2 of ch. 63 of the acts of 1894 contains the following provisions with reference to insurance companies: "If any insurance company incorporated under the laws of another state or of any foreign government shall fail to pay and satisfy any judgment or decree rendered against it by any court of this state in favor of any policy holder within thirty days from the adjournment of the court at which such judgment or decree is rendered, or to take an appeal, giving a supersedeas bond as the law requires, within that time, it shall be unlawful for such company to do business in this state thereafter until such judgment or decree be paid and satisfied or appealed from as required above."

When the case reached the supreme court, the appellee moved to dismiss the appeal, basing the motion on the act of 1894 and the fact that the judgment was not paid or appealed from with supersedeas within thirty days after its rendition.

*S. L. Dodd* and *Frank Johnston,* for the motion.

1. The appellant as an insurance company is within the operation of the act of 1894. The record shows that it is regularly incorporated by the state of Missouri. The so-called benefit associations are simply mutual life insurance companies. Policies are issued to members insuring their lives, and death losses are paid on the mutual assessment plan. These corporations are just as much within the policy and purpose of the statute as regular life insurance companies.

2. The operation of this statute is not confined to fire insurance companies. The first section of the act is an amendment of the code of 1892, but the second section is a new and distinct

enactment, and wholly independent of any subject contained in the code. It treats of appeals with supersedeas as affecting the rights of plaintiffs with judgments against insurance companies.

There is nothing in the second section to limit its application to fire insurance companies, and its provisions are equally applicable to life insurance as to fire insurance. The purpose is to require appeals to be taken promptly by all insurance companies.

*Mc Willie & Thompson*, against the motion.

1. The act of 1894 relates only to insurance companies, and the appellant is not an insurance company, but a benefit society. *Supreme Lodge* v. *LaMalta*, 95 Tenn., 158; *State* v. *Mutual Pro. Asso.*, 26 Ohio St., 19; *Com.* v. *Nat., etc., Asso.*, 94 Pa. St., 481; *Com. League* v. *People*, 90 Ill., 166; *Choctaw Friends* v. *Fairman*, 62 How. Pr. (N. Y.), 386; *State* v. *Iowa, etc., Asso.*, 12 N. W. Rep., 782.

2. Said act relates only to fire insurance companies, and the appellant is not a fire insurance company. The maxim, *noscitur a sociis*, applies to the provision relating to payment of judgments contained in section 2.

3. Said section 2 in nowise affects the right to prosecute an appeal, but makes it unlawful to carry on the business of insurance in case of default.

4. Even in case of default in payment within the prescribed thirty days, the restriction upon the right to carry on an insurance business by the terms of the act ceases upon the execution of a supesedeas bond and taking of appeal, which has been done in this case.

5. The statute law of Mississippi differentiates societies like the one in question from insurance companies by exempting them from the payment of the taxes required of the latter as well as by relieving them of the duty of making statements to the auditor of public accounts imposed upon insurance companies. Code 1892, ch. 65, acts of 1900, pp. 53, 54.

6. The provisions of section 2 clearly indicate that such companies were within the contemplation of the legislature as came within the supervisory authority of the auditor.  ·

*J. A. P. Campbell,* on same side.

The motion is founded on misconception of section 2 of chapter 63, acts of 1894.    That law in no way limits or restricts the right of appeal—that is unimpaired.    All the section does is to hold *in terrorem* the prohibition to carry on the business of insurance until payment of the judgment or an appeal with supersedeas, when the suspension of the right to carry on the business would end.    The whole object is to spur, to hasten payment or appeal with supersedeas.    There is no interference with the right of appeal.    The continuing right to appeal is distinctly recognized.    While the language " any insurance company " is broad, its universality is restrained by the context, which shows that fire insurance companies alone are referred too and dealt with.    The act is amendatory of a code section relating alone to fire insurance companies.    This appellant is not a fire insurance company of any sort, and is not embraced in our legislation on insurance companies.    It is not touched by the code chapter.    It pays no tax, makes no application to the auditor, gets no license to do business and is not regarded by our laws as an insurance company.    It is a benevolent society, it has no capital stock and no stockholders.

CALHOON, J., delivered the opinion of the court on the motion.

This is a motion by appellee to dismiss the appeal, and it is based on section 2, act 1894, pp. 51, 52, entitled "An act to amend § 2330 of the annotated code of Mississippi in reference to valuation of property and measure of damages in suits upon insurance policies in cases of loss by fire, and to provide for the enforcement of judgments against insurance companies." Whether this act applies to life insurance companies at all, or,

if it does, whether a mutual benefit society such as appellant, with life insurance as a mere incident to membership, is a life insurance company within the purview of the act, we need not; and therefore do not, now decide.    We decide this motion solely on the ground that the act in no way disturbs the right of appeal, but simply prohibits doing business further in the state unless payment of a judgment is made or appeal with supersedeas taken within thirty days from its rendition.

*Motion overruled.*

### ON THE MERITS.

The main issue of facts presented by the pleadings was whether or not the insured, one D. B. Noah, committed suicide. In the course of the trial, the defendant offered to read in evidence a certified copy of the proceedings and finding of the coroner's jury which held an inquest over the body of the decedent.    Objection being made thereto by plaintiff, the court below sustained the objection and refused to allow the same read, and the defendant excepted.    At the close of the evidence the defendant asked for a peremptory instruction, which the court below refused.

*C. H. Campbell* and *W. A. Hayden,* for appellant.

Did Noah commit suicide?    That is the question.    What is the evidence on that issue?    On the night of November 30, 1899, deceased occupied a room with one Perkins.    When Perkins retired Noah seemed to be asleep.    Perkins was the railroad agent at Fayette, Mississippi.    On the morning of December 1st, about 7 o'clock, Perkins dressed and started to his place of business.    Noah was awake; they had some conversation.    In two hours he was found dead—lying across the bed in his night clothes, with a gunshot wound entering just above and in rear of right ear, passing out just above and in rear of left ear, a pistol gripped in his right hand, powder indications on the left forefinger and the left thumb and' also where the wound was on the right side of head, with one chamber of the

pistol freshly discharged, as clearly shown by C. C. Coffey's evidence; deceased's gold watch lying on a chair, $1.40 in his pockets. Deceased had requested T. B. McGinty, an acquaintance, some weeks before, if anything should happen to him, if he should be killed, to ship or carry his remains to Kosciusko; had written a note to McGinty reminding him of his promise or the request he had made of him, when starting on a bird hunt a few days before his death. Going out to the hunting ground he told J. V. Arnold about the note he had written McGinty; talked about his life insurance, said he had eleven thousand dollars, one thousand of which was to defray his burial expenses; told Arnold if anything happened to him that day, if he should be killed or fall down and kill himself, to roll him in the buggy and haul him to town and turn him over to Tom, meaning McGinty; he knew what to do with him. When on the hunt Arnold came upon Noah with the muzzle of his gun against his breast, in a dangerous position. Arnold called his attention to it; he changed position. After that, when they had agreed to separate and to each go a different way, Arnold found him sitting on a log in or near some bushes with his handkerchief to his eyes crying. The evidence shows that the pistol found gripped in Noah's hand was a 38 Smith & Wesson; that the ball picked out of the wall of the room was a 38 ball; the pistol the same one which he borrowed a few days before from one J. F. Costley, with one chamber empty and four loaded when borrowed. From these facts and many more testified to by the witnesses, is the conclusion not irresistible that D. B. Noah committed suicide?

What evidence is opposed to this? None of a tangible, certain, positive character. Some uncertain evidence about a sunken place under the left eye by witnesses who saw deceased in the coffin at Kosciusko. No examination made. Trying to get up some conflict as to where the shot entered the head of deceased.

We submit, if deceased took his own life, it was immaterial

where the ball entered, though the evidence is overwhelming that it went through the head, from right to left, just above and behind the ears.

Under the well-defined legal rules, will the court permit this verdict and judgment to stand on the evidence in this case? If so, how is suicide to be established, unless by eyewitnesses?

We submit that the peremptory instruction asked by defendant should have been given. *Swan* v. *Insurance Co.*, 52 Miss., 704; *Whitney* v. *Cook*, 53 Miss., 551; *Railroad Co.* v. *Doyle*, 60 Miss., 977; *Holmes* v. *Simon*, 71 Miss., 246; *Bernheim* v. *Dibrell*, 66 Miss., 199; *Railroad* v. *Cathey*, 70 Miss., 332; *Dobson* v. *State*, 67 Miss., 330.

*J. A. P. Campbell*, on same side.

The single question was, Did Noah commit suicide? I have never known a verdict more clearly in the face of the overwhelming preponderance of the evidence than this, which was for the plaintiff for the full amount claimed. If ever a case is to be presented in which this court shall perform its duty to prevent the looting of a benevolent society by an unwarranted verdict, this is it. I affirm, and with absolute confidence, without a doubt or a misgiving from the testimony, that Noah committed suicide.

The facts undisputed are these: He was found lying upon a bed which he had occupied the night before, with his feet upon the floor, his head about the middle of the bed in a pool of blood issuing from two orifices, one on the right and the other on the left of his head, just above the ears, with a pistol grasped in his hand, one chamber of which had been recently discharged; he had been dead when discovered something like two hours; the room had been occupied the night before by a friend of his with him, who had gone out for an early breakfast, closing the room door after him. There is not a suggestion nor hint nor shadow of ground for suspicion that death

came by any other means than from the pistol in the hands of Noah.

The only effort to impair the force of this convincing testimony as to the manner of Noah's death, consisted of evidence that a bullet was found in the wall of the room about forty-four inches from the floor, while Noah's head was but twenty-two inches from the floor, and that the range of the bullet was downward. The worthlessness of such testimony is manifest. What the position of Noah was when he fired the fatal shot is a matter of conjecture. He may have been standing by the bedside or sitting upon it and have fallen backwards as found. Nothing can be known as to this. There remains the indisputable fact that he was found in his blood, with the instrument of death in his hand, with his feet upon the floor, and with the orifices of entrance and exit of the fatal missile. It is impossible to know what his precise posture was. If standing or sitting on the bedside when the fatal shot was fired, or lying down with his head in a certain position, all difficulty about the course of the bullet vanishes. That the bullet that passed through Noah's head made the hole in the wall, is mere conjecture. It seems most probable, if we enter a field of conjecture, that he did not place himself in the position in which he was found in order to shoot himself, but most likely that he would stand or sit so as to fall back upon the bed. His feet being on the floor and his arms and hands as they were strongly suggest this.

Besides this effort to break the overwhelming evidence of the manner in which he met his death, many witnesses were introduced at Kosciusko who looked at the corpse in the coffin, and testified that they did not see any holes or signs of pistol bullet wounds in the head of deceased, and this doubtless furnished the pretext for a jury, in an atmosphere favorable to the plaintiff, to disregard testimony of a most satisfactory character and find the verdict on the assumption that the man did not come to his death by a pistol shot at all. Two reputable phy-

sicians of Fayette, the sheriff of the county, a coroner's jury and divers others saw the corpse, saw the holes in the head, saw the pool of blood and brains issuing out, and yet a set of witnesses in Attala county aided in getting up the idea that the man didn't die from a pistol shot, and thus settled the question that he did not commit suicide, but died a natural death. I call upon this august tribunal, in the name of outraged justice, to vindicate the law from being child's play, in which facts are to be disregarded and justice trampled under foot by a compliant jury.

With two girls as plaintiffs and a nonresident corporation as defendant, counsel were enabled to obtain from the jury what was called the verdict—a true saying—anything but what its name would import. It should have been promptly set aside by the circuit judge, and I trust the day has not come when the verdict of a jury is too sacred even for this high tribunal to set it aside, and I ask that it be done.

There is much to suggest that Noah contemplated suicide. His oral and written request for his body to be sent to Kosciusko in case of his death, his strange conduct on the hunt with Arnold, his preparation in borrowing a pistol which he did not return at the end of the trip for which he borrowed it, his payment of his saloon bill and of the newsboy the night before his death, his talk of going home, his want of preparation for the trip—no trunk packed or valise, with no money except $1.40, when the train was due about half-past nine o'clock— his unusual cheerfulness and joviality, characteristic of suicides, supplement the ghastly presentation of the corpse and its environment, and exclude all doubt as to suicide. A doubting Thomas could not honestly doubt the evidence. 103 Iowa, 395.

I think the court erred in excluding the duly certified copy of the verdict of the coroner's jury. It was certainly not needed to convince an honest inquirer after truth, but it was the finding of a legal body, which viewed the corpse of Noah, that he came to his death by his own hand. It was part of the

proof of loss, and was not properly separated from it. All should have gone together as a whole to the jury. The company acted on it as a unit, and all should have gone to the jury. It was admissible by itself perhaps. 3 Taylor on Evidence, sec. 1674; 1 Greenl., sec. 556; 2 Rice on Evidence, sec. 428; Wharton on Evidence, secs. 403, 812, 1254. But certainly as part of the proof of loss, which, though made by the agent of the company, was approved by the plaintiff, adopted and relied on by him, and necessary to make out his case. *Ins. Co.* v. *Higginbotham*, 95 U. S., 380, p. 390, approving *Ins. Co.* v. *Newton*, 22 Wall., 32, s. c. 184 Ill., 236.

*Frank Johnston*, *S. L. Dodd* and *Hill & Sisson*, for the appellee.

The case depends entirely upon the sole issue of fact whether the death of the insured was the result of an accident or other cause, or of a suicidal act, and this issue was determined by the jury upon purely circumstantial evidence. The burden of proof that the death was by suicide rested upon the defendant, the presumption being against the theory of suicide. The evidence left the issue gravely in doubt in respect to the cause of the death, and the presumption against suicide was not overcome or removed by the defendant's evidence. The issue was tried by the jury upon the law, which was fairly and correctly given by the court, and a verdict rendered for the plaintiff for $2,000, the amount sued for.

It will be observed that no possible reason or motive can possibly be assigned, directly or indirectly, from the evidence, for the act of suicide. On the contrary, so far as is shown by the evidence, the deceased had no reason or motive for such an act. The character, disposition, habits and surroundings of the deceased are all clearly shown; his business capacity, financial condition and family relations are all clearly explained, and all of these considerations strongly negative the idea of suicide. While the absence of motive for an act of suicide

would not be controlling in a case of direct and positive testimony, yet this is of powerful, if not controlling, force in a case of purely circumstantial evidence, and where any conclusion must be reached on a balancing of probabilities or conjectures. The presumption of law, as well as the natural presumption, is strongly against the idea of suicide by a sane person, and where the issue is doubtful and the evidence circumstantial and doubtful, this presumption should prevail.

Mr. Bliss, in his work on life insurance, thus states the rule: "Where the defense is suicide, the defendants are entitled to begin, as the onus is on them to prove that the death was by suicide, and where it appears that the death was the result either of accident or of suicidal injury, the presumption is in favor of the former." Bliss on Life Insurance (2d ed.), p. 624.

The rule is thus stated in the text of Cooke on Life Insurance: "The question whether in any given case a death is or is not the result of suicide, is obviously one of fact. The only limitation of this rule seems to be that, where the facts proved with reference to the mode of death admit equally the inference that the death was the result of accident or of a suicidal act, the finding shall be that the death was accidental, the presumption being that the instinct of self-preservation will keep a person from attempting his own life." Cooke on Life Insurance, p. 73, sec. 44.

In May on Insurance the rule is thus defined: "When the dead body is found under such circumstances and with such injuries that the death may have resulted from accident or suicide, the presumption is against suicide as contrary to the general conduct of mankind, a gross moral turpitude, not to be presumed in a sane man." May on Insurance (1st ed.), p. 384, sec. 325.

In the case of *Mallory* v. *The Travelers Ins. Co.*, 47 N. Y., 52, the court, in its opinion, said: "From the facts above, it appeared either that the death was caused by such an injury [an accidental] or by the suicidal act of the deceased, but the

presumption is against the latter. It is contrary to the general conduct of mankind. It shows gross moral turpitude in a sane person.''

Tested by the doctrine thus announced, the law of the case was correctly given by the trial court in this case.

CALHOON, J., delivered the opinion of the court on the merits.

In this action on a life insurance policy the sole question before the jury was whether the death was by suicide. By the laws of the order sued, the beneficiary is required, as a condition precedent to recovery, to furnish it with satisfactory evidence of the death, and '' in case of sudden death, the certificate of the coroner, under seal, will invariably be required, and in all cases of death from unknown causes, the particulars and result of any investigation held in the case must be furnished.'' The order offered the proofs of death, a part of which was the finding of the coroner's inquest, but the court excluded that part of these proofs. It was error to let in part without the whole. In fact the finding of the coroner's inquest jury was admissible as independent evidence and was *prima facie*, though not conclusive, of the cause of death. *U. S. Life Ins. Co.* v. *Vocke,* 129 Ill., 557; *Fein* v. *Covenant Mu. Ben. Asso.,* 60 Ill. App., 274; *Walther* v. *Mutual Life Ins. Co.,* 65 Cal., 417; *Ins. Co.* v. *Higginbotham,* 95 U. S., 380–390.

We regret to do so, but must differ from the view of the very accomplished circuit judge, of the evidence indicated by his refusal to grant the peremptory instruction asked by the defendant. We think the evidence of intentional self-murder, on the case shown by this record, overwhelming. The testimony of every one who saw the body within two hours after the tragedy, the situation of the body, the nature of the death wound, the previous verbal request that his body be sent home if anything happened to him, and the subse-

quent note to the same effect, his curious action with a gun while hunting, and the evidence of a physician that he had periods of observable despondency, his borrowing and not returning the pistol, which was undoubtedly the weapon used in inflicting the death wound, and the finding of the six sworn men of the coroher's jury, make the conclusion of suicide to our minds irresistible. The condition of the body, the wound and the pistol in the hand, would be enough. The pressure of the evidence for the defendant excludes all but conjectures of the most imaginative type of possible accident or murder from another hand, and the plaintiff cannot splint up the loose joints of mere conjecture with even plausible possibilities, and these the law does not require the defendant to negative in proof.

The third plea of defendant was not demurrable. It properly set up the laws of the order, and under them the forfeiture of the benefit by suicide. We need not consume time on the instructions.

If this case is tried again the astute and learned judge below will readily see and correct the errors in them from the tenor of this opinion.

<em>Reversed and remanded.</em>