NICHOLS, RESPONDENT, v. NEW YORK LIFE INSURANCE CO., APPELLANT.

(No. 6,626.)

(Submitted June 24, 1930. Decided July 19, 1930.)

[292 Pac. 253.]

*Mr. Charles R. Leonard* and *Mr. W. D. Kyle,* for Appellant, submitted a brief and argued the cause orally.

*Mr. L. C. Myers* and *Mr. N. A. Rotering,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiff secured a verdict and judgment for $2,000, with interest and costs, against defendant based upon a policy of insurance. Defendant's motion for new trial was denied and it appealed from the judgment.

The policy of insurance was issued on January 20, 1926, and insured the life of Maude B. Nichols, plaintiff's wife. By the terms of the policy, $1,000 became payable to plaintiff, beneficiary, if death resulted from natural causes, and $2,000 if death resulted "directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause." By the complaint recovery was sought of $2,000 under the double indemnity clause, the insured having died April 12, 1927. The complaint charged that "death resulted, directly and independently of all other

causes, from bodily injury effected solely through external, violent, and accidental cause, to-wit: by the taking or swallowing of strychnine poisoning, by mistake and accident."

Defendant by answer admits that death occurred after the taking and swallowing of strychnine poisoning and denies the other allegations of the complaint above referred to. The answer sets forth, by way of an affirmative defense, that the policy of insurance contains this clause, "In event of self-destruction during the first two insurance years, whether the insured be sane or insane, the insurance under this policy shall be a sum equal to the premiums thereon which have been paid to and received by the company and no more," and alleges that death resulted from self-destruction by the insured by taking and swallowing strychnine poisoning with intent to take her own life. Defendant tendered to plaintiff and deposited in court the amount paid by plaintiff to defendant as premiums on the policy. The reply admits that the policy of insurance contains the clause set forth in the answer and that defendant made the tender alleged, and denies the other allegations of the answer.

The question presented to us is whether there was sufficient evidence to go to the jury and to sustain its verdict.

Defendant contends that there was no evidence to sustain the allegation that death resulted from injury through "external, violent, and accidental cause," or to support the charge that the strychnine poisoning was taken and swallowed by "mistake and accident." Defendant's contention is that all of the evidence in the case tends to support its charge that insured intentionally destroyed her own life. The question was raised by motion for a directed verdict at the close of all of the evidence, and by motion for a new trial.

The evidence tending to show the circumstances under which the strychnine poisoning was taken and swallowed by insured was as follows: Plaintiff testified that on the day of his wife's death he was living in Butte and that he "got up about 8:30 or 9:00 o'clock" in the morning. He said: "It was the usual custom for Mrs. Nichols to wake up first; owing to the fact

that a great deal of my work was night work, I slept late in the morning and she got up and built the fires. This morning she awakened and asked me, she said, 'Will you build the fire?' and I said, 'Yes,' and I got up and started the fire, and after the fire got going I told her to get up and get breakfast. She said to me, 'You get breakfast this morning; you didn't get breakfast for a long time,' and I said I didn't feel like cooking and I didn't care to get breakfast.'' She consequently prepared the breakfast. An altercation took place between plaintiff and his wife, she insisting that he should buy her a new hat for Easter, and he insisting that they could not afford it at that time. After the quarrel plaintiff said he ''went over to the sink where she was washing dishes, and I said, 'Let's kiss and forget this stuff, and make up.' '' She turned sideways and said, ''I won't kiss you.'' He then left and went to his garage and worked on his car for about thirty or forty minutes, after which he went from place to place about the city, and at about midnight he boarded a street-car and went home. He said: ''In the daytime I recalled I had an argument with my wife, and I presume likely that was part of the reason I stayed away all day, I stayed away from lunch and dinner. * * * I presume when two people have an argument, there is more or less upset feeling on each side and that was the condition that caused it.'' He admitted stating that he had stayed away until he thought she had gotten over her spell. He did not attempt to call his wife by telephone during the day. He had no recollection of ever before, after returning from his work, staying away from home all day and up to midnight without giving her some notice. A short time after reaching home he was informed by a neighbor that his wife had died at about midnight and was then in the undertaking parlors. He said his wife had been suffering from a cold for about three weeks previous to her death and had been taking different kinds of medicine, among which were aspirin, bromo-laxative and epsom salts. A family medicine cabinet was maintained in the home containing a variety of medicines, among which were quinine capsules, but

plaintiff said "there was no strychnine in the house to my knowledge and never was." He inquired at a number of drug-stores situated nearest his home as to whether they had any record of a sale of strychnine on the day in question, and could find no record of such a sale.

Mr. and Mrs. John Douris, in behalf of plaintiff, testified that Mrs. Nichols had a cold at the time and prior to her death, for which she was taking a cough medicine. E. R. Slater, a friend and neighbor of Mr. and Mrs. Nichols, testi-fying for plaintiff, said he was called to the Nichols home by Mrs. Slater about 5:30 in the afternoon of the day of Mrs. Nichols' death, and Mrs. Nichols asked him to look for Mr. Nichols and she also said to him, "Ellis, what have I ever done to make me so sick?"

Dr. Donald Worden, testifying for defendant, said that he was called to the Nichols apartment at about 2 P. M. on April 12. He found Mrs. Nichols in bed and extremely nervous. He had to obtain most of the history of her condition from two other ladies who were present because, as he said, Mrs. Nichols "didn't seem to want any attention at the time; she was hardly responsive, she was hard to question and hard to talk with at the time." He was again called at 4 o'clock and at this time he discovered signs of strychnine poisoning. At this time Mrs. Nichols was conscious and could be questioned and she "answered with seeming intelligence." She then told him that she had taken three capsules which she said she had obtained at the corner drug-store. One of the ladies present gave him a box containing three capsules, which upon ex-amination were found to contain strychnine. One capsule was sufficient to cause death in an adult person. He said, "I asked Mrs. Nichols if these were the capsules she had taken, and I don't remember if she told me she had actually taken the capsules, but she said she wished she had taken three more. Only in that reference did she indicate to me that the capsules she had taken were the same as those con-tained in this box." On cross-examination he said, "I don't believe she told me she took any strychnine."

Mrs. Benjamin Snoddy testified that she went to the Nichols home between 1 and 1:30 o'clock in the afternoon of the day of Mrs. Nichols' death. Mrs. Nichols was in bed suffering. She called a doctor, and after he arrived, Mrs. Nichols said she had taken three capsules, and that she said she wished she had taken two or three more. She found the box containing the capsules on the kitchen table. She said that Mrs. Nichols just prior to passing away said, "Please, mother, forgive me, and God forgive me."

Mrs. Ellis Slater testified that she saw Mrs. Nichols at about 11 o'clock on the day of her death. The witness occupies an apartment "a couple of doors" from the Nichols apartment and saw them every day. At about 11 o'clock in the morning of the 12th of April Mrs. Nichols came to the apartment of the witness and said, "I had a big fight with that s. b." She was then mad and so stated to the witness. She also said: "I am through with the world, all through. I am going to take poison and end it all." She next saw Mrs. Nichols in bed in the afternoon when called to the Nichols apartment by Mrs. Snoddy. Mrs. Nichols tried to get more of the capsules but the witness prevented her doing so. On cross-examination this witness admitted that she gave false testimony at the coroner's inquest, and explained that she did so to protect Ernest Nichols.

It will be observed from the foregoing synopsis of the evidence that there is nothing in the record tending to show that the strychnine was taken by accident or mistake. Plaintiff's contention is that there is a presumption against suicide and in favor of accident. While this is not one of the presumptions specifically mentioned in our statutes, the adjudicated cases abundantly support the contention that such a presumption exists. (14 R. C. L. 1235.)

The burden of proof rested with plaintiff to show that death was caused by "external, violent, and accidental means." (*Tuttle* v. *Pacific Mutual Life Ins. Co.*, 58 Mont. 121, 16 A. L. R. 601, 190 Pac. 993, 995.) Death resulting from the taking of poison by mistake is from external, violent and acci-

dental means. (*Healey* v. *Mutual Accident Assn.,* 133 Ill. 557, 23 Am. St. Rep. 637, 9 L. R. A. 371, 25 N. E. 52.) Where, as here, death is shown as the result of external and violent means and the issue is whether it was due to accident or suicide, the presumption is in favor of accident. (*Withers* v. *Pacific Mutual Life Ins. Co.,* 58 Mont. 485, 193 Pac. 566.) We have then in this case a presumption of accident in favor of plaintiff's claim as against evidence of suicide supporting defendant's contention.

The precise question, then, is this: Does the presumption, when controverted by positive evidence, as here, make a sufficient case for the jury?

Plaintiff contends that the case of *Johnson* v. *Chicago, M. & St. Paul Ry. Co.,* 52 Mont. 73, 155 Pac. 971, is determinative of the question in favor of his contention that the question is one for the jury. That case is not controlling here, for there a statute made the killing or injury of the livestock prima facie evidence of negligence on the part of the railroad company. There is no statute making proof of death prima facie evidence that it resulted from accident. But even as to statutory presumptions the rule is that the presumption "fades away in the face of contrary facts" (*Welch* v. *All Persons,* 85 Mont. 114, 278 Pac. 110), when they are so overwhelmingly against the fact presumed as to permit of but one reasonable and rational conclusion.

Our attention has been directed by plaintiff to cases sustaining the contention that the presumption in favor of accident is sufficient to carry the case to the jury, when the presumption is rebutted by evidence showing suicide or intentional killing. But in some of those cases there was strong circumstantial evidence supporting the presumption, and in others the presumption was not in fact controverted, while in still others the facts did not point to suicide as clearly as do those in this case. Here we have evidence of a quarrel between husband and wife of sufficient moment to cause the wife to reject the proposal of the husband to kiss and make up; that she obtained strychnine from the drug-store

and swallowed three capsules, expressing the wish that she had taken more; reluctance on her part to submit to treatment by the doctor to alleviate her condition, and imploring divine forgiveness and forgiveness by her mother. All this appears aside from the testimony of Mrs. Slater, which it is urged should be rejected. This evidence leads but to the one reasonable conclusion of suicide.

Even the evidence of plaintiff tends to overturn rather than support the presumption. Plaintiff's evidence, while showing that Mrs. Nichols was suffering with a cold at and prior to the time of her death and that she was taking medicines to break up the cold, tends also to show that the strychnine capsules were not taken by mistake because, according to his own testimony, there were no strychnine capsules kept in the house which might have been mistaken for quinine or other capsules. Also, the statement, "What have I ever done to make me so sick," shown by plaintiff's witness Slater to have been made by Mrs. Nichols after taking the poison, does not, as contended by plaintiff, show that she was not aware of the fact that she had taken poison. This statement, taken in connection with the other undisputed facts, is reconcilable with the fact of suicide and does not support the claim of accident or mistake. She might have thought that self-destruction by swallowing strychnine would not be preceded by a period of sickness, particularly when three capsules were taken, while one was sufficient to cause the death of an adult.

The presumption against suicide must give way to evidence to the contrary where it all points to suicide as the cause of death with such certainty as to preclude any other reasonable hypothesis. And when the evidence points overwhelmingly to suicide as the cause of death, the question becomes one of law for the court and not a question to be submitted to the jury.

The supreme court of Nebraska, in *Hardinger* v. *Modern Brotherhood of America,* 72 Neb. 860, 103 N. W. 74, 75, in holding that death in that case resulted from suicide, as a matter of law, used language which may well be applied to

the facts here. It said: "It may be stated at the outset that self-destruction is not to be presumed. In other words, the presumption arising from the general conduct of mankind is that a sane person will not destroy his own life. But this is a rebuttable presumption, and easily yields to physical facts clearly inconsistent with it. It is not proof, nor does it stand in the way of proof, and, when sufficient evidence is introduced to overcome this legal presumption, it disappears. On mature reflection, we are of unanimous opinion that the proof in this case clearly overthrows the presumption above mentioned, and excludes all probability of death by accident or by the hand of another. The undisputed facts and circumstances in this case lead naturally and rationally to but one inference, and that is that George S. Hardinger shot himself intentionally. It seems to us that no other fair, just or reasonable conclusion is possible. When the facts naturally and reasonably lead the mind to but one conclusion, there must be something in the circumstances, something somewhere in the evidence, to suggest murder or accident. No circumstances can be pointed out consistent with the use of the weapon, for some unexplainable purpose, from which accidental shooting probably resulted; to indulge in such inference is to engage in a fanciful conjecture. The basis of such a conclusion is not to be found in the evidence, but if it exists at all it is altogether outside of it, and is a guess, a surmise or a conjecture. No fact or circumstance can be pointed out in the evidence which indicates that the use made of the revolver by Hardinger was accidental, and there is nothing in the record from which a presumption of death by murder can be justified. There is no conflict in the evidence; it all points unmistakably and clearly to death by suicide. Any other conclusion would outrage all reason; and had the question been left to the jury, and had that body found otherwise, its finding would have been set aside as against the evidence. A verdict of the jury for the plaintiff in this case would have had no basis except mere conjecture. In such a case it is

the duty of the court to treat the matter in question as one of law, and direct the proper verdict.''

As stated by the supreme court of Wisconsin, in *Agen* v. *Metropolitan Life Ins. Co.*, 105 Wis. 217, 76 Am. St. Rep. 905, 80 N. W. 1020, 1022: ''It is said that the legal presumption is that the circumstance which caused Griffin's death was the result of accident or some outside human agency, and that is true. But it is a rebuttable presumption and easily yields to physical facts clearly inconsistent with it.'' To the same effect are *New York Life Ins. Co.* v. *Watters,* 154 Ark. 569, 243 S. W. 831; *Supreme Lodge, Knights of Honor,* v. *Fletcher,* 78 Miss. 377, 28 South. 872, 29 South. 523; *Fletcher* v. *Sovereign Camp Woodmen of the World,* 81 Miss. 249, 32 South. 923; *Life & Casualty Insurance Co.* v. *Andrews,* 149 Miss. 306, 115 South. 548; *Richey* v. *Woodmen of the World,* 163 Mo. App. 235, 146 S. W. 461; *Newland* v. *Modern Woodmen of America,* 168 Mo. App. 311, 153 S. W. 1097; *Brunswick* v. *Standard etc. Co.,* 278 Mo. 154, 7 A. L. R. 1213, 213 S. W. 45; *Clemens* v. *Royal Neighbors of America,* 14 N. D. 116, 8 Ann. Cas. 1111, 103 N. W. 402; *Green* v. *New York Life Ins. Co.,* 192 Iowa, 32, 182 N. W. 808; *Inghram* v. *National Union,* 103 Iowa, 395, 72 N. W. 559; *Mutual Life Ins. Co.* v. *Hayward,* (Tex. Civ. App.) 27 S. W. 36; *New York Life Ins. Co.* v. *King,* 28 Ga. App. 607, 112 S. E. 383; *Deweese* v. *Sovereign Camp, W. O. W.,* 110 Kan. 434, 204 Pac. 523; *Texas Life Ins. Co.* v. *Childress,* (Tex. Civ. App.) 204 S. W. 1035; *New York Life Ins. Co.* v. *Weaver,* 8 Fed. (2d) 680; *Mutual Life Ins. Co. of New York* v. *Gregg,* 32 Fed. (2d) 567; *Planters' Bank* v. *New York Life Ins. Co.,* 11 Fed. (2d) 602; *Aetna Life Ins. Co.* v. *Alsobrook,* 175 Ark. 523, 299 S. W. 743.

It is also contended by plaintiff that the testimony of Dr. Worden and Mrs. Snoddy was impeached or the witnesses were discredited by reason of discrepancies between their testimony given at the trial and before the coroner, and for that reason it was for the jury to say whether their testimony should be believed. We have carefully considered the entire

testimony of these witnesses and find that this contention cannot be sustained. There is no variance between the testimony given by these witnesses at the trial and at the inquest. In some particulars their testimony is more complete at the trial than before the coroner, but that is accounted for by the fact that questions were propounded to them at the trial which were not asked of them at the inquest. The rule is that uncontradicted credible evidence may not be disregarded. (*Sylvain* v. *Page*, 84 Mont. 424, 63 A. L. R. 528, 276 Pac. 16; *Laundreville* v. *Mero*, 86 Mont. 43, 69 A. L. R. 416, 281 Pac. 749; *Haddox* v. *Northern Pac. Ry. Co.*, 43 Mont. 8, 113 Pac. 1119.)

We think the evidence points unerringly to suicide as the cause of death. The court erred in denying the motion for directed verdict.

The cause is remanded, with directions to set aside the judgment and to enter a judgment for plaintiff for the amount of the premiums paid by him to defendant; defendant to be allowed its costs on appeal.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, GALEN and FORD concur.

Rehearing denied September 26, 1930.