200 So. 873

## NATIONAL LIFE & ACCIDENT INS. CO. v. KARASEK.

6 Div. 821.

Supreme Court of Alabama.
March 6, 1941.

Wm. A. Jacobs, of Birmingham, for appellant.

Robt. S. Gordon and Nina Miglionico, both of Birmingham, for appellee.

662

THOMAS, Justice.

■ The rendition of judgment against defendant is assigned as error. The case was tried by the court without a jury, and the recognized presumptions obtain to support the judgment rendered. Andrews v. Grey, 199 Ala. 152, 74 So. 62.

The suit was on a policy of life insurance with a double indemnity clause when death was caused by accidental means. Plaintiff-appellee is the beneficiary under said policy with double indemnity benefits issued by defendant-appellant insurance company to his wife, who died on September 16, 1939, "of arsenic poisoning," due to taking a dose of rat poison. The defendant-appellant paid the value of said insurance policy in case of natural death and secured from plaintiff a "Death Claim" receipt, signed by him. But defendant refused to pay the double indemnity benefits for accidental death.

On the day preceding her death, the insured had gone with Mrs. Sullivan, the lady in whose home she and her husband were living, to a doctor's office. Mrs. Sullivan, however, and not the insured, was the patient. Later they drove by the home of a lady with whom insured and her husband had previously stayed, and who had just lost her husband, the insured being fond of that friend's children. That afternoon the friend and the insured played cards and had several drinks. The insured's husband went by this house to bring his wife back with him, but she did not so return. According to the friend, who testified for the defendant, there was no evidence of friction between the husband and wife. Mr. Karasek, the insured's husband, states in substance that they must have had something planned, that is why she didn't want to come back. We had not had any trouble or disagreement that night, no argument at all. The next morning September 15th, the insured got this friend "to promise her that I would go back and get her that afternoon." But Mrs. Powell further stated, "I didn't have any special trouble in getting her to go home" and took her home about one p. m.; that she was not especially agitated, and "I took her over to her house and just let her out;" and that the insured found her husband, the plaintiff-appellee, at home. They had a conversation for thirty minutes, and then he went out to get his tire fixed. The evidence further shows that Mrs. Sullivan saw her shortly after 3 p. m. of the same day and insured "was sitting on her bed and said she felt bad;" that she presented herself dressed in a "gown, a smock"; that Mrs. Sullivan went back and talked to her about 4 p. m. for a few minutes. "She appeared to be normal. She said nothing to me about intending to commit suicide nor did she do anything at that time that would indicate that she had such intention." In about thirty minutes, around 4:45, the insured came to the front porch where Mrs. Sullivan was sitting, and asked for an envelope. She was dressed in a gown and smock. Mrs. Sullivan "Stepped inside the door to give her the envelope and she (the insured) fell in my arms." Mrs. Sullivan "asked her what was wrong, and she said that she had taken her medicine and that she couldn't see." Mrs. Sullivan took her into the kitchen where two bottles were sitting on her ice box together. The assured said, "this is what I taken." Mrs. Sullivan testified that there are two windows in the kitchen and that the ice box, on which the two bottles were sitting, was not by the window, just by the side of the wall.

One was a bottle of "Veegex" and the other was a bottle of "Rattle Cap" poison. "The two bottles had been sitting there side by side for a couple of weeks. But there were times when those two bottles were not there together." Both substances are semi-fluid and similar in color. The appellee testified "it was customary for my wife to keep the Veegex near the ice box, and the Rattle cap poison in the corner. The reason why I got the Rattle Cap was on account of the ants. I accidentally put that Rattle cap on the shelf. It was my intention to remove it."

Dr. Wallace, witness for the defendant Insurance Company, testified that although he had not prescribed the Veegex, it was a "preparation to build up the blood, vitamin B, G and B₂." He further stated "there was nothing harmful about it. It is a tonic."

Dr. Hightower, of the Hillman Hospital staff, testified that Rattle Cap poison is a semi-fluid. The color is dark brown, something like a hoar-hound color. The plaintiff-appellee, insured's husband, testified he gave the insured her first dose of Veegex. "She took it very often. She would take about three-fourths of a teaspoon full and dissolve it in water, and dissolve it, and then drink it."

Mrs. Sullivan testified that the insured took this Veegex two or three times a day, according to the directions. "She would dissolve it in water, just warm water or cold water. She would take it in a spoon and dissolve it in water just like a thick paste or sirup and then drink it."

Mrs. Sullivan took the insured into the kitchen and asked her what she had taken, and the insured stated "she took this medicine." Further that "those two bottles were sitting on her icebox together. It was fairly dark there in the room." The insured felt on the icebox, and said "this is what I taken. The Rattle Cap is what she picked up, but she told me she could not see." Further "There was a partially filled glass of water and a teaspoon near those two bottles, on the ice box. They were all three there together. The water was just a little gray and milkey looking." When she reached over there and said "I have taken," she said, "I have taken my medicine." I told her, "Well, Kathryn, you have taken the wrong thing." Her only reply was, "I am so sick." Mrs. Sullivan stated further: Mrs. Karasek did not tell me that she had taken Rattle Cap poison.

Mrs. Sullivan called an ambulance; the insured was admitted to the Hillman Hospital around 6:30 that afternoon; and Mrs. Jones, the admitting clerk, at this hospital, testified that the insured was "vomiting considerably when she came in my office. She was brought in on a stretcher. She was in pain at the time." Mrs. Jones testified that in reply to the question how she became injured, Mrs. Karasek stated to her that she took rat poison. "During the time that I was asking her questions, she was vomiting intermittently." Mrs. Jones then asked her how and by whom the poison was given, and placed on the report, "herself, on account of ill health." The admitting clerk testified that: "I wrote the exact meaning of what she said down on that sheet: The reason for doing the thing. My testimony was the substance and meaning of what she said to me." Further "What I wrote was my interpretation of what she said to me on that occasion;" that assured "didn't mention the word suicide. She didn't say anything about attempting to commit suicide;" that the patients signed the Admitting Report when they are able; but that "Mrs. Karasek did not sign any of the papers in the record. I wrote on the record that she was unable to sign * * * she was given to intermittent spells of vomiting and sickness and was unable to sign her name on these reports."

Dr. Dowdy, one of the two doctors who saw Mrs. Karasek at the hospital, testified: "Mrs. Karasek was beyond talking when I saw her. All I did was to pronounce her dead. I read the record that the man had written and saw her when she came in, and I then entered on the Hospital record: 'patient admitted 6:45 p. m. on September 15, 1939, after having taken rat poison.' I didn't know whether she took it accidentally or purposely and the hospital record doesn't show whether it was accidental or intentional death."

Dr. Hightower, doctor at Hillman Hospital, testified: "I put on the death certificate that the death was suicide. I did not speak to Mrs. Karasek. She said nothing to me. I based the statement that it was suicide on what other people told me."

The evidence shows that Mr. Karasek, the insured's husband, got to the hospital about 7:30 that night, and asked insured, "What on earth happened?" and she said "God knows, honey, I don't know, I don't remember." Mr. Karasek said "God have

mercy on you" and she replied "I have done the wrong thing."

The defendant appellant's witness Ballard said that he used to be an agent for the defendant appellant; that he investigated this claim, "the company didn't send me, I just went around there;" talked with Mrs. Sullivan and she told him that "Mrs. Karasek had told her at the time that she took this medicine that she had taken something that it would send her where you cannot write letters."

Mrs. Sullivan testified in rebuttal that she did not tell Mr. Ballard that but she told him that Mrs. Karasek had taken Rattle Cap poison. Mrs. Karasek did not tell me in substance, so Mrs. Sullivan testified that she had taken poison and that she was going where they did not send mail; she did not tell me anything like that. "I didn't tell Mr. Ballard that she had told me anything like that."

The insured was treated by Dr. S. N. Wallace during the first part of April, 1939, because she was in the habit of taking morphine. She was treated in the hospital until April 30th and the doctor stated: "When she left the hospital I had her entirely off of morphine. As far as I know, she did not go back to the habit." He further testified that: "During my subsequent examinations of her, I did not see any evidence that she had gone back to the habit. Her physical condition improved and when I last saw her on September 5th, she was much stronger."

Mrs. Sullivan, the lady with whom insured was living at the time of her death, testified that her mental and physical condition was better on September 15th than when she first moved there. Mrs. Powell, the lady with whom the insured spent the night of September 14th, testified, "I didn't notice that she was particularly nervous the next morning (September 15th)"; that she did not notice any particularly violent conduct and "The best I can remember she acted as an ordinary person would act under the same or similar circumstances."

Mr. Karasek testified that he and the insured had been married for five and one-half years and there was evidence that they were on good terms, Mrs. Sullivan testifying, "They loved each other and I never heard them arguing and fussing," and Mrs. Powell testifying, "I did not see any evidence of friction between them."

Mr. Karasek, beneficiary under the policy sued upon, presented due notice of death of the insured to defendant-appellant insurance company and received from it the amount due on the face value of the policy in case of death by natural causes, being $448 plus .60 premium due and $4.60 voluntary additional payment. He signed a release for defendant-appellant on the insurance policy, the company declining to make payment under the double indemnity clause of the policy. Therefore, the beneficiary under said policy filed this suit to recover the double indemnity benefit payable under the policy in case of accidental death of assured.

There are well recognized rules that obtain in respect to insurer's liability on a policy of accident insurance, the prima facie presumption being that insured's death did not result from suicide. The result follows the presumption that injuries are not self-inflicted. Inter-Ocean Casualty Co. v. Foster, 226 Ala. 348, 352, 147 So. 127; New York Life Ins. Co. v. Turner, 213 Ala. 286, 104 So. 643; Mutual Life Ins. Co. of N. Y. v. Maddox, 221 Ala. 292, 128 So. 383; Sovereign Camp, W. O. W. v. McLaughlin, 237 Ala. 33, 35, 185 So. 378.

In National Life & Accident Ins. Co. v. McGhee, 238 Ala. 471, 478, 191 So. 884, 890, it is declared: " * * * under the presumption of law that injuries were not intentionally inflicted by insured. Inter-Ocean Casualty Co. v. Foster, 226 Ala. 348, 147 So. 127. That is to say, we have indicated that under the several tendencies of evidence, it was a question for determination by the jury whether death of insured (whose body was found in the river) resulted from drowning or accident or violent means. Metropolitan Life Ins. Company v. James, supra (225 Ala. 561, 144 So. 33)." Parenthesis supplied.

When death or injury results from taking poison by mistake, the injury or death results from external, violent or accidental means within the terms of a policy of insurance. National Life & Accident Ins. Co. v. McGhee, supra; Nichols v. New York Life Ins. Co., 88 Mont. 132, 292 P. 253; McNally v. Maryland Casualty Co., 162 Wash. 321, 298 P. 721; Republic Life & Accident Ins. Co. v. Hatcher, 244 Ky. 574, 51 S.W.2d 922; Pixley v. Illinois Commercial Men's Ass'n, 195 Ill.App. 135.

It follows from the foregoing that the fact of accidental injury and death was correctly found by the trial court sitting without a jury and hearing the evidence ore tenus.

The defendant's pleadings were among other things accord and satisfaction, and it is urged that by payment of the recognized liability on account of the death of insured, plaintiff had full accord and satisfaction. The record recites that: "Plaintiff's attorney asked for the policy sued on, which policy was in the possession of the defendant company. Defendant's attorney delivered the policy to Plaintiff's attorney with the stipulation that the records should show that the policy was in the possession of the defendant and was being parted with only for use as evidence in this trial. Thereupon Plaintiff's attorney offered in evidence the policy which was in words and figures as follows:".

The plaintiff, as a witness, testified:

"I was the beneficiary in two policies issued by the Defendant Company on the life of my wife. One of those policies was for the face amount of $140.00, being the policy sued on in this case and being No. 17823246. The other of those policies was for the face amount of $308.00, sued on in another case now pending, being Policy No. 15964764.

"At this point the witness was shown a written instrument headed 'Death Claim Receipt.' And testified in regard thereto as follows:

"That is my signature on that instrument (referring to the death claim receipt, Defendant's Exhibit No. 3). I executed it at the time I received from the Company that $452.60. I received that amount from the Company on those two policies at the time I executed that instrument.

"At this point the Defendant offered said instrument in evidence, which instrument was admitted in evidence and was in words and figures as follows: here follows copy of the death claim receipt." (parenthesis supplied.)

On his redirect-examination, the witness said further: "This policy sued on in this case is for $140.00. The other policy was for $308.00. That is a total of $448.00 provided for by the two policies. I received a check for $452.60."

The provision of the policy declared on in this suit is: "Double Death Benefits for Accidental Death.—Upon receipt of due proof at the Company's Home Office that the insured, after attainment of age five and prior to the attainment of age seventy, has sustained bodily injury directly and solely through external, violent, and accidental means occurring after the date of this Policy and resulting in the death of the Insured within ninety days from the date of such bodily injury, which this Policy is in force and while no premium is more than four weeks in arrears, the Company will pay, in addition to any other sums due under this Policy * * * a benefit for death by accidental means equal to the sum insured."

It was to this feature of the policy that accord and satisfaction is urged by the company. The burden of establishing accord and satisfaction is upon the party so pleading. First Nat. Bank of Montgomery v. Montgomery Cotton Mfg. Co., 211 Ala. 551, 101 So. 186. Appellee's counsel states the facts of the payments, as we have indicated above, and as touching the double indemnity clause of the policy. The death claim receipt, which the reporter will set out, speaks for itself as being for the face of each policy. Said receipt was for the face of the two policies, a small accrued dividend and approximately four dollars in excess of the amount due under the policies.

It is said that the acceptance of a check declared to be in full payment of a liquidated debt does not, without more, constitute an accord and satisfaction. In American Life Ins. Co. v. Williams, 234 Ala. 469, 175 So. 554, 556, 112 A.L.R. 1215, it is said: "The authorities reason that the payment of an amount admitted to be due in respect to one feature of a transaction cannot be the basis of an agreement to forego another feature of it, though the latter is disputed or unliquidated. Brent v. Whittington, 214 Ala. 613, 108 So. 567; 1 Corpus Juris Secundum, Accord and Satisfaction, p. 502, § 29(2)."

In the instant case the plaintiff executed the written release set out and received $452, the three amounts indicated above. Under the terms of that instrument, the plaintiff released defendant from any and all further claims or demands under those policies. There is no plea of fraud.

Appellant rests its defense upon Code of 1923, § 5643, which follows: "An obligation is extinguished by a release therefrom given to the debtor by the creditor, *upon a new consideration, or in writing with or without new consideration.*" [Italics supplied.]

This section was originally found in the Code of 1923. It is insisted that it sets up a new and different kind of "accord and satisfaction" which was not known to the

common law. And in addition, thereto, the Alabama law prior to 1923, as found in the Code of 1923, was as contained in Section 3974 of the 1907 Code, which reads as follows: "All settlements in writing, made in good faith for the composition of debts, must be taken as evidence, and held to operate according to the intention of the parties, though no release under seal is given, and no new consideration has passed."

This section is contained in the Code of 1923 as Section 7670 and comes to us from the Code of 1852. It should be noted that in the 1852 said section was 2283. Section 7669 of the 1923 Code is found in the Code of 1907 as § 3973 and comes to us from the Code of 1852, § 2282. Section 7669 of the 1923 Code is as follows: "All receipts, releases, and discharges in writing, whether of a debt of record, or a contract under seal, or otherwise, must have effect according to the intention of the parties thereto."

■ It is observed that § 5643 and § 7669, Code of 1923, are to be considered as a part of one system on evidence.

■ Were the payments made when the policies were delivered and receipt given, as we have above indicated, an accord and satisfaction under our statutes? Was the $4.60 paid in excess of the policies a gratuity (Illinois Cent. R. Co. v. Johnston, 205 Ala. 1, 87 So. 866; Inter-Ocean Casualty Co. v. Foster, 226 Ala. 348, 147 So. 127), or did it effectuate an accord and satisfaction on the indemnity clause set out above?

In the Johnston case, supra, a release for personal injury procured by fraud was involved, and in the Foster case, supra, it was held that: "In action on accident policy, where defendant pleaded release, overruling demurrer to replication averring fraud in procuring release, in that defendant represented that no settlement was intended but money was donated, held not error, notwithstanding replication did not show offer to restore sum received."

In Biggers v. Ingersoll et al., 236 Ala. 646, 184 So. 478, 479, in speaking through Chief Justice Gardner, this court said: "Reverting to the matter of a consideration, it was observed in Penney v. Burns, supra (226 Ala. 273, 146 So. 611), that it exists when 'something substantial which one party is not bound by law to do has been done by him, or that something he has a right to do he abstains from doing at the request of the other party.' But this principle finds no application to the instant case." [Parenthesis ours.]

Section 5643 was before the court in the case of Cotton States Life Ins. Co. v. Crozier, 218 Ala. 173, 118 So. 327, where it is observed that the release in writing was that of a matured obligation for the payment of money on a policy of insurance. The charge given in the Crozier case, supra, was: "'I charge you, gentlemen of the jury, that the obligation on this insurance policy may be extinguished by a release therefrom given by the plaintiff to the defendant upon a new consideration, or in writing with or without a new consideration.'" The court said that the "special charge, made the predicate for assignment of error 5, asserting that a release in writing of a matured obligation for the payment of money, given without consideration was sufficient to extinguish liability was properly refused." In that case no consideration was paid on the policy of insurance. It should be said further of the Crozier case, supra, that therein no plea of accord and satisfaction was considered.

In Hamilton, Tax Collector, v. Edmundson, 235 Ala. 97, 177 So. 743, 746, it was held:

"* * * A release is a contract and must be supported by a lawful and valuable consideration; and, if not supported by a lawful consideration, is nudum pactum. Brown v. Lowndes County, 201 Ala. 437, 78 So. 815, 817. * * *

"In Brown v. Lowndes County, 201 Ala. 437, 78 So. 815, the authorities are collected as touching the statutes that in an extent abrogate the rule of the common law as to receipts, releases, and discharges in writing and the composition of debts under Code 1907, §§ 3973, 3974. The decision in the case of Hand Lumber Co. v. Hall, 147 Ala. 561, 563, 564, 41 So. 78, 79, is quoted from in the Brown v. Lowndes County Case, supra, as follows: '"'The rule that the payment of a less sum than the real debt will be no satisfaction of a larger sum without a release by deed applies only to conceded or undisputed demands. Where the claims are in dispute, the compromise and part payment thereof are sufficient consideration to support the discharge.' * * * The cases of * * * Hodges v. Tennessee Implement Co., 123 Ala. (572) 573, 26 So. 490, each involved an indebtedness by note, and in those cases there was no dispute as to the existence of the indebtedness as evidenced by the written obligations. In each of them the holding was that on part payment of the

debt, *without surrender of the note* (italics supplied), the agreement by the creditor to accept in discharge of the debt a less sum in money than the debtor owed was a nude pact, constituting no bar to a recovery of the balance." Brackin v. Owens Horse & Mule Co., 195 Ala. 579, 581, 71 So. 97, 98.'

"This ruling has been followed in Bryan v. Spivey, 223 Ala. 298, 299, 135 So. 443, 444, where the court said:

" 'In earlier cases, it appears to have been held that the statute intends that on part payment of the debt evidenced by an agreement in writing, without a surrender of the writing—in this case promissory notes—the agreement by the creditor to accept in discharge of the debt a less sum in money than the debtor owed is a nude pact and constitutes no bar to a recovery of the balance. * * *' "

Appellant insists that the ·Alabama law has been changed by the enactment of Section 5643 of the Code, as above indicated, and that the cases decided prior to that enactment are overruled to the extent they are in conflict therewith. In every case in which Section 5643 of the Code has been referred to by the court, the plain language of that section has been accepted. Davis v. Anderson, 218 Ala. 557, 119 So. 670; Penney v. Burns, 226 Ala. 273, 146 So. 611; Alabama By-Products Corp. v. Kennedy, 228 Ala. 410, 153 So. 862; Carns v. Commonwealth Life Ins. Co., 233 Ala. 215, 171 So. 382 (involving release for insurance notes); Biggers v. Ingersoll, 236 Ala. 646, 184 So. 478.

In Davis et al. v. Anderson, 218 Ala. 557, 119 So. 670, 671, Mr. Justice Foster writes as follows: "The contention of appellants that the cross-bill does not show that the contract is void is probably well sustained. Its effect, if valid, was to release and cancel the notes first executed, and fix the debt at a smaller sum, evidenced by notes maturing earlier than those formerly executed. Such a release comes within the words of sections 5643 and 7669 of the Code. The former makes such a contract, in writing, valid, with or without a new consideration. The latter makes all written releases and discharges effective according to the intention of the parties. (Citing cases where the mortgage debt was reduced in writing reciting a valuable consideration.)" (Parenthesis supplied.)

In Penney v. Burns, supra [226 Ala. 273, 146 So. 612], it is stated: "It is conceded that appellant is correct in the assertion of the legal principles which he invokes to predicate a reversal. They are: *Since there was no written contract of accord and satisfaction,* it cannot be sustained unless it is supported by a 'new consideration.' Section 5643, Code * * *. (The action being based on promissory notes.)" (Parenthesis ours.)

In Alabama By-Products Corp. v. Kennedy, supra [228 Ala. 410, 153 So. 863], · Mr. Justice Bouldin said:

"We need not again review our decisions construing the sections of our Code giving full effect to receipts and releases in writing. There is a distinction between an ordinary receipt and a release, but a release may be given, and usually is given, in connection with a receipt for a sum in final settlement of demands expressly defined therein.

"It is not necessary that the sum actually paid be a portion of a disputed demand, as a consideration for an accord and satisfaction, not evidenced by writing. Code, § 5643. * * *"

Cotton States Life Ins. Co. v. Crozier, supra, was probably the first case to come before this court after the adoption of the Code of 1923, in which Section 5643 was given application. In that case the court was dealing with a matured obligation and it was held that the statute in question did not apply, as above indicated.

In this case the trial court held that the assured had done no more than the law required in the payment of the two amounts of the respective policies, the accrued dividend, and the sum of $4.60 asserted by counsel for appellee to be a gift or gratuity. The delivery of the policies to the insurer and the acceptance of the face value of them and the additional fund, in the absence of fraud in procuring the receipt, was·an accord and satisfaction of the double indemnity clause contained in the policy now declared on. The circuit court held that the delivery of the policies and · the execution of the usual form of receipts did not discharge the double indemnity clause feature contained in one of the policies, that here sued on, for an accidental death. This is not in accord with our interpretation of the last expressions of the legislative will. Code 1923, §§ 7669, 5643.

It is true that the payment made appellee was a small amount in excess of the face of the two policies. The receipt given when the policies were delivered by appellee to appellant recites that it was in

full settlement, discharge and satisfaction of all claims or demands of every kind under and arising out of the policies and concludes with the words "and release it (appellant) from all liability under and by reason of said policy contract of insurance." This was accord and satisfaction under the statute and decisions to which we have adverted.

It results that the judgment of the circuit court should be and it is hereby reversed and rendered for the appellant, and appellee is taxed with the costs in the circuit court and in this court.

Reversed and rendered.

GARDNER, C. J., and BROWN and FOSTER, JJ., concur.